GUNTHER, J.
Appellants, Samuel and Marilee Susi (“Susis”) appeal from a final summary judgment and cost judgment entered in favor of Appellee, St. Andrews Country Club (“St. Andrews”). We affirm.
The Susis are residents of St. Andrews, a planned unit development. St. Andrews provides both golf and tennis memberships. Golf members have full access to all the facilities, while tennis members havé access to all the facilities except the golf courses. The Susis are tennis members who are seeking to upgrade to a golf membership. Because St. Andrews refused their requested upgrade on the grounds that no memberships were available, the Susis sued claiming that, under the By-laws, they had priority and were entitled to one of 38 new golf memberships created by an amendment to the By-laws. The trial court disagreed and granted St. Andrews’ motion for summary judgment.
On appeal the Susis contend that summary judgment in favor of St. Andrews was improper and that they were entitled to summary judgment. Although the Susis raise several issues on appeal, we need only address whether St. Andrews breached its contract with the Susis by failing to follow the priority schedule provided in its By-laws.
At the time the Susis became tennis members, the Articles of Incorporation provided that “[t]he club shall have a maximum of six hundred fifty seven (657) golf members,” and the By-laws provided that “[t]he. club will offer a maximum of six hundred fifty seven (657) golf memberships.” Regarding distribution of memberships, the By-laws provide,
*1060 2. Eligibility for Memberships. A golf or tennis membership will be offered to owners of homes or lots in the Club.... Once the maximum number of members in either category (golf or tennis) is achieved membership in that category will be available on a reservation basis, in accordance with the priority schedule set forth in Section 3, herein below.
3. Priority for Offering of Memberships.
(a) First Priority — To purchasers of homes in the Club, whose owners are members in good standing of the Club at the time of transfer of title, and who own a golf or tennis membership. Such purchasers shall have the opportunity to purchase the membership of the owner of the home they have purchased.
(b) Second Priority — To current golf or tennis members in good standing who wish to apply for membership in the other category.
(c) Third Priority — To individuals who purchase a lot or home in the Club and apply for a golf or tennis membership and for which the current owner does not own a golf or tennis membership.
In June 1990 the By-laws were amended reducing the number of offered golf memberships from 657 to 575. Thereafter, on two separate occasions, the members of St. Andrews were notified that the number of available golf memberships were dwindling. In June 1992 all the available 575 golf memberships were issued and a waiting list was started. However, the Susis did not place their name on the waiting list at this time.
In October 1992, the president of St. Andrews called a special meeting to increase the number of golf memberships. The purpose of the proposed increase was to honor St. Andrews’ pre-existing contractual obligation to builders in St. Andrews who claimed they were entitled to full golf memberships for their “undeveloped lots, including unsold model and spec homes.” The Articles of Incorporation, Article XII Amendment of the By-laws, specifically requires a majority vote of the membership to change the number of memberships and also expressly denies the Board the authority to make such changes. Further, the By-laws, Article VI, section 7, provides that the Board does not have the power to amend or change any valid action taken by a vote of the membership. The majority of the membership voted by ballot to increase the number of existing golf memberships to 613, providing 38 new memberships “for every vacant lot and spec/model home.”
Despite the language of the ballot, the amendment to the By-laws simply provides, “[t]he Club will offer a maximum of six hundred thirteen (613) golf memberships,” there being no language indicating that the distribution of these new memberships will be limited to “every vacant lot and spec/model home.” These new golf memberships were then offered to the owners of the 38 vacant lots and spec/model homes. Seven of the new homeowners declined membership. The Board then determined that these seven memberships were “available” and offered the seven memberships to those on the waiting list in accordance with the priority schedule of the.By-laws. Because the Susis were not on the waiting list at that time they were not offered a membership. However, prior to filing this action, the Susis placed their name on the waiting list and are currently number 17. Had the Board not interpreted the amendment to the By-laws as requiring that the initial distribution of the 38 new golf memberships as being limited to “every vacant lot and spec/model home,” the 38 new memberships would instead have been “available” and subject to distribution according to the By-laws, section 3(b), second priority.
The Susis assert that the Board’s interpretation of the amendment to the By-laws is not relevant and that the precise language of the amendment should govern this situation. Arguing that the precise language of the amendment to the By-laws does not limit the 38 new golf memberships to “every vacant lot and spec/model home,” the Susis contend that the 38 new memberships are “available” and subject to distribution according to the By-laws, section 3(b). Having concluded that the 38 new memberships are available, the Susis argue that they have priority pursuant *1061 to By-law 3(b) and that being 17 on the list would clearly entitle them to one of the 38 new memberships.
St. Andrews counters that the St. Andrews membership added the 38 new golf memberships for the purpose of honoring contractual obligations and limited the initial distribution of new memberships to the owners of “every vacant lot and spec/model home.” Further St. Andrews maintains that the By-laws give the Board the final interpretative authority, and according to the Board’s interpretation, the priority schedule did not apply to the initial distribution because the memberships were never intended, from the time they were authorized by the members, to be “available” for general distribution. Rather, the Board concluded, based upon the ballot, that these memberships were earmarked “for every vacant lot and spec/model home.”
Preliminarily, although the amendment to the By-laws does not conform to the language of the ballot as voted on by the’ majority, we conclude that pursuant to the governing documents of St. Andrews, the amendment to the By-laws must conform to the ballot language. Consequently, in resolving the issues in this case, the amendment to the By-laws must be interpreted as including the ballot language that the new memberships are provided “for,every vacant lot and spec/model home.”
In Boca West Club, Inc. v. Levine, 578 So.2d 14 (Fla. 4th DCA 1991), the Levines membership was suspended because the bylaws provided that all members must be homeowners and the Levines transferred the title of their home to the bank. See Boca West, 578 So.2d at 15. When the Levines joined the Club they signed an agreement to be bound by the terms of the articles and the by-laws. See id. Following their suspension, the Levines sought relief from this Court because the by-laws were ambiguous. See id. Concluding that judgment should be entered for the club, this Court provided,
[sjince the by-laws provided that the Board has the final interpretative authority regarding doubtful or conflicting portions of the bylaws, and their interpretation is neither arbitrary or unreasonable, we will not interfere with its authority to construe them.
Id. Further, this Court explained,
The appellees purchased their membership in the club with full knowledge of its rules and regulations, including the power of the Board of Governors in determining the application of such rules and the extent of their authority over its members. Appel-lees [the Levines] cannot now be heard to complain about the actions taken by the Board given their assent to be bound by the provisions of the by-laws and rules.
Boca West, 578 So.2d at 16.
While in the present case the By-laws which are in effect do not provide the Board has the “final interpretative authority regarding doubtful or conflicting portions of the By-laws,” as in Boca West, the By-laws do give the Board of St. Andrews the right to interpret the By-laws and all parts thereof. See Boca West, 578 So.2d at 16. In addition, the Board’s interpretation that these memberships were not available and the priority schedule did not apply to the 38 new memberships is neither arbitrary nor unreasonable. In fact, the Board’s interpretation was required based upon the language of the ballot and the Board’s inability, under the By-laws, to alter a vote of the membership.
“The relationship between a social club and its members is one of contract.” Garvey v. Seattle Tennis Club, 60 Wash.App. 930, 808 P.2d 1155, 1157 (1991). “When courts intervene in the internal affairs of a social elub it is only to determine whether the club has violated its own rules.” Id. Further, “[i]t is a well established proposition in Florida law that ordinarily courts will not intervene in the internal affairs of ... voluntary associations.” National Collegiate Athletic Ass’n v. Brinkworth, 680 So.2d 1081, 1084 (Fla. 3d DCA 1996)(citing Rewolinski v. Fisher, 444 So.2d 54, 58 (Fla. 3d DCA 1984)).
In sum, the Board has authority to interpret the amendment to the By-laws. In this case, the Board’s interpretation that the 38 new golf memberships had to be first offered to the owners of “every vacant lot and spec/model home” was neither arbitrary nor unreasonable. Likewise, the Board’s inter *1062 pretation that under the priority schedule, there are no golf memberships “available” for distribution is neither arbitrary nor unreasonable. As such, the Board did not breach its contract (the By-laws) with the Susis. Accordingly, we affirm the trial court.
AFFIRMED.
SHAHOOD and TAYLOR, JJ., concur.