Sullivan
No. 2002-689

PHILLIP SCHAEFER & a.

v.

EASTMAN COMMUNITY ASSOCIATION

Argued: September 11, 2003
Opinion Issued: October 27, 2003

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Thomas J. Donovan* and *Jeremy T. Walker* on the brief, and *Mr. Donovan* orally), for the plaintiffs.

*Devine, Millimet & Branch, P.A.*, of Manchester (*Alexander J. Walker, Jr.* and *Daniel E. Will* on the brief, and *Mr. Walker* orally), for the defendant.

DUGGAN, J. This case involves a dispute between the plaintiffs, certain homeowners in the planned, private community of Eastman, and the defendant, Eastman Community Association (ECA or association), a non-profit corporation that governs Eastman. ECA appeals a decision by the Superior Court (*Mangones*, J.) finding that ECA did not have authority under its Declaration of Covenants and Restrictions (declaration) to close Snow Hill ski area. We reverse.

Eastman is a planned, private, four seasons, recreational community located primarily within the town of Grantham. The community is organized into groupings of residences, known as "Special Places," some of

which contain the recreational activities or amenities offered at Eastman. The amenities include a golf course, tennis courts, an indoor pool, cross country skiing, hiking, and a lake with beaches and facilities for boating and swimming. Until September 1999, Eastman also offered downhill skiing at its own ski area known as Snow Hill. While the association owns and maintains the recreational amenities, the residents of Eastman own their homes and also own indivisible, equal interests in the common property.

The Articles of Agreement (articles) establish ECA as a non-profit corporation organized under RSA chapter 292. The articles provide that ECA's affairs shall be managed by a board of directors, subject to the powers and limitations set forth in the declaration. The declaration is the governing document for the Eastman community and sets forth the residents' rights and privileges and the terms of the association's operation. All property within Eastman is subject to the declaration. Pursuant to the declaration, the association operates by means of a three-tiered representative form of government: Special Place Associations, the Association Council, and the ECA Board of Directors.

Each Special Place has its own Special Place Association, which consists of all property owners within the Special Place. Each member of the Special Place Association is entitled to vote on: (1) the election of representatives to the Association Council; (2) the matters affecting the conduct of the affairs of their Special Place; and (3) all matters affecting the conduct of the affairs of ECA by making recommendations to the appropriate bodies.

The Association Council (council) consists of representatives from each Special Place. Representation on the council is proportional to the size of the various Special Places and currently totals eighty-seven members. The council has the power to: (1) remove members of the ECA Board of Directors; (2) propose amendments to the declaration; (3) propose special assessments; (4) make recommendations to the ECA Board of Directors; and (5) appoint a Finance and Budget Committee to prepare and present to the ECA Board of Directors the annual operating and capital expenditure budgets for the association.

The ECA Board of Directors (board) is comprised of nine directors who are elected by the property owners for three-year terms. The board has numerous powers enumerated in the declaration and has the ultimate responsibility for making decisions regarding policies, finances and administration at Eastman.

As early as 1984, the residents and the governing bodies debated whether the Snow Hill ski area should remain open. In 1994, the results of

the Eastman Long Range Planning Committee's survey of Eastman residents indicated that Snow Hill ski area was of little importance to the families and the community. In 1998, Cilley & Associates conducted a survey that found that of 695 respondents, sixty-eight percent had never used Snow Hill. ECA also commissioned other studies performed by area college business students to assist their analysis of whether Snow Hill should remain open.

On August 27, 1999, the Eastman Recreation Committee, a subcommittee of the council, voted eight to zero, with two members abstaining, to recommend closing Snow Hill ski area to the board and accept Ski Whaleback, Ltd.'s offer to purchase Snow Hill's chairlift. On September 4, 1999, the council held a meeting and voted forty-three to nineteen to recommend to the board closing Snow Hill and selling the chairlift to Whaleback. On September 17, 1999, the board voted eight to one to close Snow Hill and sell the chairlift to Whaleback.

The plaintiffs subsequently filed an action in superior court seeking: (1) to enjoin ECA from closing Snow Hill and selling the chairlift; and (2) damages based on trespass, deceit, negligent misrepresentation, violation of RSA chapter 358-A and *ultra vires*. At the first part of a bifurcated trial, the plaintiffs argued, and the superior court agreed, that ECA acted *ultra vires* in closing the Snow Hill ski area because the declaration did not provide for the closing of an amenity. The court enjoined the closure of Snow Hill until and unless:

> (a) there is a future amendment of the Declaration of Covenants providing a lawful process for the closure of a major amenity or (b) a determination is made to do so by the Board of Directors based on financial conditions, or other substantial conditions establishing that continuation of alpine ski operations would be inequitable, unreasonable or oppressive, within the context of an overall, four-season, recreational and residential community.

In accordance with the superior court's order, ECA amended the declaration to specifically provide for the closing of an amenity. ECA amended article II of the declaration to define "amenity" as "[a] common recreational facility or activity designed to enhance the social welfare and enjoyment of Owners." ECA amended article VII of the declaration to include the following provision: "The Board shall have authority to . . . (g) close any amenity with the approval of two-thirds of the Council. In reaching this judgement the Board may take into account, among other factors, the cost of preserving, maintaining, and/or improving the amenity

and the extent of Owner usage it receives." The amendments became effective on January 20, 2001.

On March 23, 2001, the board, following the process established by the amendment, requested the council's approval of the board's decision to close Snow Hill ski area. On April 14, 2001, the council, also following the process established by the amendment, voted forty-five to nine to approve the closing of Snow Hill ski area.

At the second part of the bifurcated trial, the plaintiffs argued, and the superior court agreed, that the amendment to the declaration did not provide a lawful procedure for closing an amenity and thus the second vote to close Snow Hill ski area was invalid. Specifically, the superior court ruled that the amenity closing procedure was unlawful because it did not "reflect the disparate impact that the closing of a major amenity would cause," nor did it "reflect an appropriate vote in accordance therewith[,]" namely, the unanimous consent of the Snow Hill Special Place representatives to the council. The superior court also awarded the plaintiffs attorney's fees and damages. This appeal followed.

ECA first argues that the trial court erred in finding that the board's September 17, 1999 vote to close Snow Hill ski area was *ultra vires*. Because we hold that the board acted within its authority under the declaration when it voted to close Snow Hill ski area on September 17, 1999, we need not address the other issues raised by ECA.

"When a court is called upon to assess the validity of [an action taken] by a board of directors, it first determines whether the board acted within its scope of authority and, second, whether the [action] reflects reasoned or arbitrary and capricious decision making." *Beachwood Villas Condo. v. Poor*, 448 So. 2d 1143, 1144 (Fla. Dist. Ct. App. 1984); *accord Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n.*, 980 P.2d 940, 944 (Cal. 1999). Because the reasonableness of the board's decision to close Snow Hill ski area was not questioned below or on appeal, we are only concerned with the scope of the board's authority.

Inquiry into this area begins with a review of the association's legal documents. *Beachwood Villas Condo.*, 448 So. 2d at 1144. The association's legal documents are "a contract that governs the legal rights between the [a]ssociation and [property] owners." *Lacy v. Sutton Place Condo. Ass'n. Inc.*, 684 A.2d 390, 393 (D.C. 1996). Because the association is a corporation, it may not act in any way not authorized by the articles or the declaration. *S & T Anchorage, Inc. v. Lewis*, 575 So. 2d 696, 698 (Fla. Dist. Ct. App. 1991). "[A]cts beyond the scope of the powers so [authorized] are *ultra vires*." *Seabrook Island Prop. Owners Ass'n. v. Pelzer*, 356 S.E.2d 411, 414 (S.C. Ct. App. 1987). Accordingly, whether the association's action

was within its authority requires us to interpret the articles and declaration. This is a question of law that we review *de novo*. *See Baker v. McCarthy*, 122 N.H. 171, 174-75 (1982).

In determining whether the declaration provides the board with the authority to close Snow Hill ski area, we should be mindful that the declaration is the association's "constitution." *See Beachwood Villas Condo.*, 448 So. 2d at 1145. Generally, declarations and other governing documents contain "broad statements of general policy with due notice that the board of directors is empowered to implement these policies and address day-to-day problems in the [association's] operation." *Id.* Thus, the declaration should not be so narrowly construed so as to eviscerate the association's intended role as the governing body of the community. Rather, a broad view of the powers delegated to the association "is justified by the important role these communities play in maintaining property values and providing municipal-like services . . . . If unable to act, the common property may fall into disrepair. . . ." RESTATEMENT (THIRD) OF PROPERTY § 6.4 comment *a* at 90 (2000); *cf. Joslin v. Pine River Dev. Corp.*, 116 N.H. 814, 817 (1976) ("[P]rivate land use restrictions 'have been particularly important in the twentieth century when the value of property often depends in large measure upon maintaining the character of the neighborhood in which it is situated.'").

■ Because an association's power should be interpreted broadly, the association, through its appropriate governing body, is "entitled to exercise all powers of the community except those reserved to the members." RESTATEMENT (THIRD) OF PROPERTY § 6.16. Accordingly, "provided that a [board's action] does not contravene either an express provision of the declaration or a right reasonably inferable therefrom, it will be found valid, within the scope of the board's authority." *Beachwood Villas Condo.*, 448 So. 2d at 1145. This rule preserves the concept of delegated management and carries out the expectations of property owners who purchased property subject to, and with notice of, the association's governing instruments. Moreover, the rights of property owners are safeguarded by the terms of the governing instruments and through their power to remove or replace the board members through the election process. *See* RESTATEMENT (THIRD) OF PROPERTY § 6.16 comment *b* at 289; *see also Beachwood Villas Condo.*, 448 So. 2d at 1145.

■ In the present case, the decision to close Snow Hill ski area does not contravene an express provision of the declaration; nor is it a decision reserved to the members. Rather, the defendant relies upon three provisions of Article 7.6 of the declaration that affirmatively provide the

association with authority to close the Snow Hill ski area. These provisions provide that:

> The Board shall take all such measures as may be necessary to:
>
> . . .
>
> (h) take steps necessary to protect the Association's assets and insure its financial stability[;]
>
> . . .
>
> (j) buy and sell property when deemed in the best interests of the Association;
>
> . . .
>
> (n) take such other action as it may deem necessary to further the purposes of this Declaration or to be in the best interests of this Association.

Because the decision to close the ski area or any other amenity may be necessary to insure financial stability or be in the best interests of the association, it is a decision that is reserved in Article 7.6 for the association to make, through the board, and thus within the board's authority.

The plaintiffs argue that, pursuant to the declaration, ECA lacked authority to close the ski area because it was neither "necessary to insure ECA's financial stability," nor "in the best interests of Eastman." This argument is misplaced. Whether the association's decision was in fact either necessary to ECA's financial stability or in the best interests of Eastman is a question of the reasonableness of the association's action. So long as ECA's action "does not contravene either an express provision of the declaration or a right reasonably inferable therefrom, it will be found valid, within the scope of the board's authority." *Beachwood Villas Condo.*, 448 So. 2d at 1145. The plaintiffs, both in their brief and at oral argument, argued that the "reasonableness of ECA's decision is not relevant here because the Board did not act within its authority, and thus, there was no need for the trial court to address ECA's reasonableness argument." Because the plaintiffs only claimed, both here and at the trial court, that the association lacked authority to act as it did, and did not allege that the action was unreasonable, these arguments are not relevant to the question presented to us for review.

The plaintiffs also argue that, because the declaration does not expressly authorize ECA to close an amenity, such authority cannot "reasonably be inferred from the [d]eclaration in light of ECA's express

purpose to preserve and maintain the recreational amenities, as set forth in the preamble, and in light of the fact that ECA from its inception has promoted the availability of downhill skiing at Eastman." Essentially, the plaintiffs are asking that we narrowly construe the board's powers enumerated in the declaration because of the general purposes of the ECA and Eastman's promotional materials.

The plaintiffs argue that the board's powers must be narrowly construed to deny the board the authority to close the ski area because such an interpretation is consistent with the general purposes of the community. The plaintiffs assert that the general purposes of the community are found in the preamble of the declaration and ECA's statement of purpose. The preamble states that Eastman is to be "a planned residential and recreational community with permanent parks, open spaces and other common facilities for the benefit of such community and the health, safety, and social welfare of the Owners . . . within such community." In addition, the preamble further states that ECA is to "provide for the preservation, maintenance and improvement of said parks, open spaces and common facilities." ECA's statement of purpose states that ECA "was established in order to hold, maintain, and administer the Community's facilities and Open Spaces within Eastman."

In addition, the plaintiffs argue that a narrow interpretation of the board's powers would be consistent with promotional materials distributed by Eastman. The plaintiffs point to a number of materials that specifically promote the Snow Hill ski area, which they relied upon in deciding to purchase a home at Eastman. For example, a Community Services Guide that was published shortly before ECA closed the ski area promoted Eastman as:

> [A] recreational community for all seasons offering residents the best of all worlds in its 3500 acres of protected natural environment . . . a 325-acre lake for swimming, boating, fishing and other water sports . . . a championship 18-hole golf course, tennis courts, and indoor pool . . . miles of nature trails, 30 kilometers of cross-country ski trails . . . its own downhill ski run, softball diamond, volleyball and basketball courts.

(Emphasis omitted.) Another brochure stated: "Each neighborhood within the community focuses on a lake, golf course, ski slopes or other 'special places' and is designed to bring together families with common interests." Many brochures directly promoted the ski area by describing Snow Hill as "skiing past evergreens glistening with snow" and as "the perfect 'Special Place' for active, young families who will enjoy skiing from their front

doors, down the slope to the lift facilities in winter." Finally, the "Prospective Buyer's Guide to Eastman," which was prepared and distributed by ECA, emphasized Eastman's recreational amenities, including its own downhill ski area and double chairlift.

■ Accordingly, the plaintiffs argue, that "[w]hen considered in the overall scheme of Eastman and the purposes of ECA set forth in the [d]eclaration, discontinuance of downhill skiing at Snow Hill is not authorized by the [d]eclaration." We disagree. While the plaintiffs may have relied upon the assertions contained in Eastman's promotional materials and the overall general purposes of the ECA, neither limit the broad authority granted to ECA and its governing bodies in the declaration. Because the decision to close Snow Hill ski area does not contravene an express provision of the declaration and there are several provisions of the declaration that reserve such decision-making to the board, the board had the authority, under the declaration, to close the ski area despite the promotional materials or the stated general purposes. *See id.* Moreover, the plaintiffs purchased their properties subject to, and on notice of, the terms of the declaration, not the promotional materials provided by Eastman.

We should note that, while the board had the authority to act as it did, the plaintiffs or other similarly situated homeowners are not without recourse. The plaintiffs and other homeowners have the power under the declaration to remove or replace their community representatives at the different levels of the governing bodies through the election process. Moreover, our decision today does not give the board *carte blanche*. As a constraint on the board's broad authority under the declaration and in order to protect the rights of property owners, the board's actions must still be reasonable. *Id.* at 1144; *accord Lamden*, 980 P.2d at 944. As previously noted, the plaintiffs did not allege here or below that the board's action was unreasonable. Thus, we need not address the reasonableness of the decision.

*Reversed.*

BROCK, C.J., and BRODERICK, NADEAU and DALIANIS, JJ., concurred.