# IN THE SUPREME COURT OF IOWA

No. 09–1097

Filed December 16, 2011

ROBERT OBERBILLIG and PATRICIA OBERBILLIG
and FRANK SCAGLIONE and MELBA SCAGLIONE,

   Appellees,

vs.

WEST GRAND TOWERS CONDOMINIUM ASSOCIATION,

   Appellant.

---

Appeal from the Iowa District Court for Polk County, Joel D. Novak, Judge.

Nonprofit condominium owners association appeals ruling denying special assessment against plaintiffs for repairs to parking garage and declining to apply business judgment rule. **REVERSED AND REMANDED.**

Thomas G. Fisher, Jr. of Parrish Kruidenier Dunn Boles Gribble Parrish Gentry & Fisher, L.L.P., Des Moines, for appellant.

Robert C. Oberbillig, Des Moines, for appellees.

**WATERMAN, Justice.**

Several condominium owners brought this test case to enforce their interpretation of the condominium association's bylaw requiring the preapproval of a supermajority of owners to authorize certain expenditures exceeding $25,000. We review the resulting district court ruling that voided a unanimous decision of the elected board of directors of the nonprofit West Grand Towers Condominium Association. The board approved necessary but nonemergency repairs to the Association's parking garage without a full vote by its members. The board action followed much study, a series of meetings over several years to which all member condominium owners were invited, and a legal opinion that no member vote was required. The repairs were completed at a cost of over $200,000, eight times greater than the $25,000 threshold in the bylaw.

The owners of eighty-three of the eighty-seven condominium units voluntarily paid their respective shares of the assessment for the garage repairs. Plaintiffs, Robert and Patricia Oberbillig and Frank and Melba Scaglione, owners of the remaining four units and 4.8% of the common area, withheld payment to preserve their right to challenge the expenditure. The plaintiffs sued for a judicial declaration that the board's violation of the bylaw's preapproval requirement excused their obligation to pay. All member-owners, including the plaintiffs, have continued to use the parking garage. The Association counterclaimed against plaintiffs to collect their share of the completed repairs and for attorney fees. The case was submitted on stipulated facts for a nonjury trial. The district court accepted plaintiffs' interpretation of the bylaw, rejected the Association's defenses, declined to uphold the board's actions under the business judgment rule, and denied the counterclaim. The Association appealed.

We hold the business judgment rule applies to the governance decisions of the board of this nonprofit condominium owners association when the board acts within its authority. We conclude the bylaw at issue is ambiguous and defer to the board's authority under the governing declaration to decide questions of interpretation or application of the bylaws. Accordingly, we reverse the district court and remand for entry of judgment for the Association and for further proceedings on its counterclaim.

## I. Background Facts and Proceedings.

This case concerns the West Grand Towers, an eleven-story building with eighty-seven residential condominium units at 3663 Grand Avenue in Des Moines. Its common areas include a pool, attached clubhouse, and a two-level heated parking garage. The defendant, West Grand Towers Condominium Association, is a nonprofit corporation organized under Iowa Code chapter 504 as a membership corporation for the "maintenance, repair, replacement, administration, and operation" of West Grand Towers. West Grand Towers is a horizontal property (condominium) regime formed under Iowa Code chapter 499B. The Oberbilligs own Unit 506 and an undivided 1.310% interest in the common areas. Robert Oberbillig is an attorney who has lived in West Grand Towers since 1981. Frank and Melba Scaglione own Units 906–907 and Unit 108; they live in Units 906–907 and rent out Unit 108. The Scagliones own an undivided 3.491% interest in the common areas.

The governing documents for the Association are its "declaration" and bylaws. The owners of the condominium units are voting members of the Association and own undivided percentages of the common areas, including the pool, clubhouse, and parking garage. The members elect a six-person board of directors who must be unit owners or the spouse of a

unit owner. The directors have enumerated powers and duties that include providing "for the maintenance, repair, and replacement of the Common Elements and payments therefor . . . ." Common elements are defined to include the parking garage.

Article V of the Bylaws governs assessments and spells out the board's obligation to prepare annual budgets and determine assessments for common-element expenditures. The crux of this case is the interpretation of Section 6 entitled "Expenditures":

> Except for the management agreement described in Article II, Section 8(c) hereof and expenditures and contracts specifically authorized by the Declaration and Bylaws, *the board shall not approve any expenditure in excess of Twenty-five Thousand Dollars ($25,000), unless required for emergency repair, protection or operation of the Common Elements or Limited Common Element,* nor enter any contract for more than five (5) years without the prior approval of two-thirds (2/3) of the total ownership of the Common Elements.

(Emphasis added.) Also at issue is the meaning and effect of paragraph 6(g) of the Declaration entitled "Board's Determination Binding":

> In the event of any dispute or disagreement between any Unit Owners relating to the Property, *or any questions of interpretation or application of the provisions of the Declaration or Bylaws, such dispute or disagreement shall be submitted to the Board. The determination of such dispute or disagreement by the Board shall be binding on each and all such Unit Owners,* subject to the right of Unit Owners to seek other remedies provided by law after such determination by the Board.

(Emphasis added.)[1]

Paragraph 13(a) of the Declaration requires unit owners to pay their proportionate share of the common expenses. This requirement is implemented by Article V, Section 7 of the Bylaws, which begins, "It shall

---

[1]Article XI of the Bylaws provides, "In the event of any conflict between the terms and provisions of these Bylaws and the Declaration, the provisions of the Declaration shall control."

be the duty of every Unit Owner to pay his proportionate share of the common expenses . . . ."  This bylaw further provides that unpaid common expenses plus interest constitute a lien and that the board may sue to foreclose the lien and recover reasonable attorney fees.

The condition of the parking garage had been a concern of the board since at least March 2003.  In July of that year, the board requested an engineering study of the lower garage after large pieces of cement were dislodged.  Less than two months later, the board received a report that cracks in the upper floor of the garage should be repaired to stop leaks to the lower floor.  Board discussions concerning how to repair the garage continued for several years.  Anticipating costly repairs, the board commissioned a financial study on funding in 2006 by Financial Advisors, Inc.  The "Reserve Study" was shared with the membership in the spring of 2007.

In August 2007, consulting engineers, Shuck-Britson, provided a "parking garage structural condition study."  The study detailed problems with "numerous cracks" as well as "areas of spalling and delamination" and corrosion of the steel reinforcing the concrete.  The report recommended a combination of removal of "the deteriorated, unsound concrete and replacement with a dense concrete mix," and "repairs to the concrete beams, concrete joints, and concrete columns [which] will consist of concrete patching and epoxy crack injection.  The deteriorated concrete will be chipped out and replaced with a dense concrete mix."  This study included a preliminary cost estimate of $191,188.  The board received three bids for garage repairs ranging between $150,000 and $200,000.

Garage repairs were discussed by Association members and the board at a meeting on November 26.  Members expressed differing views

of whether garage repairs exceeding $25,000 required a membership vote. Accordingly, before the December board meeting, the board president sought a legal opinion from an attorney and former board member who owned units in the building—Thomas G. Fisher, Sr.[2] Based on Fisher's legal opinion, the board concluded it need not ask for a vote on the garage repair, "since the garage (by definition in the Declaration) is a Common Element, and the protection and operation of the Common Elements are exempt from the requirement of a vote by members of the Association under Article V, Section 6, the Bylaws of the Board." Members were informed at the December 16 meeting that garage repairs would begin in the spring and that the board "will be moving ahead with bids and letting of contracts." The requirement for a vote was again discussed at this meeting. Mr. Oberbillig stated, "[W]hen the heat exchanger failed and was replaced at a cost of $380,000, which was clearly an emergency, a membership vote was taken." Melba Scaglione objected to a further assessment.

The board provided an update to the members at a meeting on February 25, 2008. The board reported it had received firm bids in the range of $160,000 plus a fifteen percent contingency. The minutes of the meeting stated in part:

> There was discussion about the need for resident vote on the garage expenditure. Duane Jones [board president] indicated that the bylaws indicate, and it was a unanimous view of the board, that no vote is needed on this because it is maintenance of common areas. Stahl moved and Grundleger seconded and it was unanimously approved that we proceed with letting of the contracts for this project. . . .

---

[2]Mr. Fisher, a legal aid volunteer and retired corporate attorney, is the father of the attorney who represents the Association in this litigation. The parties raised no claim of conflict and stipulate that the father is not otherwise "connected in any way" with the law firm for the Association.

Barbara Grundleger then moved for a special assessment to fund the garage and this was passed unanimously.

The garage repairs began that spring and were completed that summer. The assessment levied for the garage repairs was $200,000. All members of the Association fully paid their proportionate share for the garage costs, except plaintiffs. The parties stipulated that the amount assessed for the Oberbilligs is $2620 plus interest; the amount assessed for the Scagliones is $6982 plus interest. At oral argument Oberbillig noted he had paid every other assessment, but did not pay this one out of a concern that doing so would waive plaintiffs' right to challenge the expenditure and would result in precedent for bypassing a membership vote.

On November 24, 2008, the board voted unanimously to spend over $25,000 for elevator repairs, with $50,000 to be paid from reserves and the remainder to be by special assessment, without submitting the matter to a membership vote. The elevator is defined as a common element, and the repairs were not an emergency.

A membership vote was taken previously to approve the Association's purchase of Unit G3 to be used as a fitness room and guest quarters at a cost exceeding $70,000. This was a voice vote of the members attending the meeting; no one present voted against the expenditure. Since June of 1981, five other expenditures with special assessments exceeding $25,000 were put to a vote of members attending the meeting when the board took the action. Two involved replacement of failed heat exchangers at $80,000 each; a third was for the emergency replacement of a heating system noted by Oberbillig at the December 2007 board meeting; the fourth was an earlier repair to the garage roof for approximately $80,000; and the fifth was for enclosure of balconies

on the northwest corner of the building to address heating problems at a cost of approximately $48,000.[3]

The Oberbilligs filed a petition for declaratory judgment on June 5, 2008, while the garage repairs at issue were underway. An amendment to the petition filed June 30 added Frank and Melba Scaglione as plaintiffs. The Association filed its answer, affirmative defenses, and counterclaim on July 15, seeking judgment against plaintiffs for their proportionate share of the garage repairs and for reimbursement of the Association's attorney fees. The matter was submitted to the district court on stipulated facts on April 27, 2009. Plaintiffs contended the special assessment against them was void because of the board's failure to obtain preapproval of the garage repair from two-thirds of the membership, as required by Article V, Section 6 of the Bylaws. Plaintiffs relied on the bylaw language and the Association's five previous decisions to submit expenditures exceeding $25,000 to a membership vote. The Association contended the garage repair was repair to a "Common Element" that did not require a membership vote. The Association argued the record evidence established the board "acted in good faith, the decision was reasonably prudent and the board believed the decision to be in the corporate interest" such that the business judgment rule required judgment to be entered against plaintiffs. The Association further argued the doctrine of laches barred relief for plaintiffs because they waited too long to sue.

The district court filed its ruling on June 23, 2009. The district court made the following findings relevant to the business judgment rule:

---

[3]The Declaration defines "Common Elements" to include the "exterior walls of each apartment and of the buildings."

There is no doubt that the Board was open and honest with its members in addressing the necessity of repairs to the garage. There were several meetings where the repairs and the costs regarding same were discussed where members were allowed to voice their opinions. There was nothing clandestine in the way the Board handled bringing this matter to the membership.

While the court agrees with the Association's analysis of the record that shows the directors acted in good faith, the decision was reasonably prudent and that the Board believed the decision to be in the corporate interest the court doesn't agree that the Business Judgment Rule allows the Board to ignore restrictions and limitations in the Bylaws even though the board sought legal advice in the interpretation of the Bylaws, thought their interpretation was reasonable, acted prudently and in the corporate interests. To hold otherwise would allow a board to disregard the limitations placed upon it by the Bylaw language.

The court, without relying on extrinsic evidence, went on to reject the Association's interpretation of the bylaw, stating as follows:

The court does not believe that the provision is ambiguous. The court believes that the "emergency" in the relevant provision modifies not only the word repair but also the words protection and operation. Therefore the only time the Board does [not] need to seek the prior approval of the ownership is if there is an emergency that brings about the need for repair, protection or operation of the Common Elements. The parties have stipulated that there was no emergency. Therefore the court concludes that prior approval was needed.

Assuming arguendo that the provision is ambiguous the court's conclusion would be the same. As Plaintiff points out any other construction could make the language "shall not approve any expenditure in excess of Twenty-five Thousand Dollars ($25,000.00)" useless and unnecessary because in general there are no expenditures other than normal repairs to the Common Elements. It would be unreasonable to interpret the Bylaw provision so as to give no affect [sic] to the Twenty-five Thousand Dollar ($25,000.00) limitation.

The court made further findings rejecting the Association's "laches" defense and ruled "the special assessment as applied to the plaintiffs is void and of no effect." The district court dismissed the Association's counterclaim. The Association appealed.

## II.  Scope of Review.

This declaratory judgment action was tried at law, and both sides agree our review is for correction of errors at law.  "A declaratory judgment action tried at law limits our review to correction of errors at law." *Am. Family Mut. Ins. Co. v. Petersen*, 679 N.W.2d 571, 575 (Iowa 2004).  "We are bound by well-supported findings of fact, but are not bound by the legal conclusions of the district court."  *Id.* The district court decided the meaning of the bylaw at issue without resort to extrinsic evidence.  Accordingly, the construction and interpretation of the bylaw and declaration of this condominium owners association is a matter of law for the court, and we are not bound by the interpretation and ruling of the district court.  *Peak v. Adams*, 799 N.W.2d 535, 543 (Iowa 2011) (" 'Interpretation is reviewed as a legal issue unless it depended at the trial level on extrinsic evidence.  Construction is always reviewed as a law issue.' " (quoting *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978))); *Phillips v. Nat'l Trappers Ass'n,* 407 N.W.2d 609, 611 (Iowa Ct. App. 1987) ("Corporate articles and bylaws are construed according to the general rules governing contracts."); *Schaefer v. Eastman Cmty. Ass'n,* 836 A.2d 752, 755 (N.H. 2003) (interpretation of articles and declaration of homeowner's association is question of law).

## III.  Analysis.

The Association argues the district court erred by failing to apply the business judgment rule and by misinterpreting the bylaw governing expenditures.  We first address whether the district court correctly determined Article V, Section 6 of the Bylaws unambiguously required a membership vote.  If this bylaw is ambiguous, we must decide whether to give effect to the board's interpretation pursuant to its interpretative

authority in paragraph 6(g) of the Declaration. In answering that question, we consider whether the district court erred in declining to apply the business judgment rule. We begin with a review of the applicable law.

**A. Applicable Law.** Our court has not previously adjudicated disputes over the meaning of the bylaws of a condominium owners association. The Association is a nonprofit corporation formed under Iowa Code chapter 504. In general, the articles of incorporation and bylaws "create a contractual relationship between the parties." *Bradshaw v. Wakonda Club,* 476 N.W.2d 743, 745 (Iowa Ct. App. 1991) (citing *Swanson v. Shockley,* 364 N.W.2d 252, 255 (Iowa 1985); *see also Berger v. Amana Soc'y,* 250 Iowa 1060, 1066, 95 N.W.2d 909, 912 (1959)). Accordingly, we apply the general rules for contracts to construe a corporation's governing documents. *Phillips,* 407 N.W.2d at 611.

The Association's governing documents are its declaration and bylaws, which are to be construed as a whole. *Id.*; *Carney v. Donley,* 633 N.E.2d 1015, 1020 (Ill. App. Ct. 1994) (declaration and bylaws of condominium association to be construed as a whole); *see also* 1 Gary A. Poliakoff, *Law of Condominium Operations* § 1:24 (2011), *available at* http://www.westlaw.com ("A declaration of condominium and the condominium by-laws will be interpreted together, at least where the declaration and the by-laws were executed as part of the same transaction and cross-reference one another, and the by-laws are incorporated as an exhibit to the declaration."). Here, the Association's declaration and bylaws were executed simultaneously and cross-reference each other. The bylaws specifically provide that the provisions of the declaration control in the event of any conflict. This is consistent with the view "that the declaration is the association's 'constitution.' "

*Schaefer*, 836 A.2d at 755. The *Schaefer* court, relying on the Restatement (Third) of Property, noted the Association's "power should be interpreted broadly." *Id.* at 756 (citing Restatement (Third) of Property § 6.16 cmt. *b*, at 289 (2000)). The *Schaefer* court elaborated:

> Thus, the declaration should not be so narrowly construed so as to eviscerate the association's intended role as the governing body of the community. Rather, a broad view of the powers delegated to the association "is justified by the important role these communities play in maintaining property values and providing municipal-like services. . . . If unable to act, the common property may fall into disrepair . . . ."

*Id.* (quoting Restatement (Third) of Property § 6.4 cmt. *a*, at 90). These principles guide our analysis of the Association's declaration and bylaws in this case.

**B. The Meaning of the Bylaw on Expenditures.** The parties disagree over the meaning of the language we italicize in Article V, Section 6 of the Bylaws entitled "Expenditures":

> Except for the management agreement described in Article II, Section 8(c) hereof and expenditures and contracts specifically authorized by the Declaration and Bylaws, *the board shall not approve any expenditure in excess of Twenty-five Thousand Dollars ($25,000), unless required for emergency repair, protection or operation of the Common Elements or Limited Common Element,* nor enter any contract for more than five (5) years without the prior approval of two-thirds (2/3) of the total ownership of the Common Elements.

(Emphasis added.) Specifically, the parties disagree whether "emergency" modifies only the word "repair" (the Association's position) or, whether it modifies the entire phrase "repair, protection or operation of the Common Elements" as plaintiffs contend. The district court concluded "emergency" unambiguously modifies "repair, protection or operation of the Common Elements" such that a nonemergency

expenditure for protection of the parking garage required prior approval of two-thirds of the membership.

Although we agree the plaintiffs' interpretation is a reasonable one, we disagree that this bylaw is unambiguous. "The test for ambiguity is an objective one: Is the language fairly susceptible to two interpretations?" *Nationwide Agri-Bus. Ins. Co. v. Goodwin*, 782 N.W.2d 465, 470 (Iowa 2010) (internal quotation marks omitted). We conclude another reasonable interpretation of the bylaw is the one urged by the Association—that emergency modifies only repair and that nonemergency expenditures for the "protection or operation of the Common Elements" are not subject to the two-thirds voting requirement.

The district court relied on a false premise in rejecting the Association's interpretation. Specifically, the district court accepted plaintiffs' argument that, under the Association's interpretation, the $25,000 threshold for a supermajority vote would be eviscerated "because in general there are no expenditures other than normal repairs to the Common Elements." This is untrue. The district court overlooked the prior fitness room expenditure noted in the stipulation paragraph 21(d) ("The board recommended and the owners approved the purchase of Unit G3 to be used as a physical fitness room and guest quarters at a cost of more than $70,000."). Buying a unit to add a fitness room is not a "repair" to the common elements. This example alone illustrates that the $25,000 threshold for a required membership vote is not a nullity under the Association's interpretation. We do not believe the exceptions in the bylaw swallow the rule.

The Association also correctly observes that its interpretation is supported by the "doctrine of the last preceding antecedent." We have utilized that doctrine to interpret contracts. *Cairns v. Grinnell Mut. Reins.*

*Co.*, 398 N.W.2d 821, 824 (Iowa 1987) ("[W]e have consistently reasoned that qualifying words and phrases ordinarily refer only to the immediately preceding antecedent."). As the Association observes:

> In section 6, the referential term "repair" immediately follows "emergency" thus each refers to the other. The words "protection" and "operation" are separated from "emergency repair" by a comma, but are not separated from each other by a comma and thus are separate from that phrase.

Indeed, in *State v. Lohr*, we observed, "Normally, however, referential, relative, or qualifying words and phrases refer only to the immediately preceding antecedent." 266 N.W.2d 1, 3 (Iowa 1978). "The rule is now thought to extend generally to the placement of all modifiers next to the term to be modified." *Shelby Cnty. State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 836 (7th Cir. 2002) (citing Bryan A. Garner, *Guidelines for Drafting and Editing Court Rules*, 169 F.R.D. 176, 195 (1997) ("To avoid ambiguity, place a modifier next to the word or phrase it modifies.")) (applying Iowa law).

The Association notes the board may be required to make "emergency" repairs within a condominium unit whose owner is travelling or unavailable. Thus, "emergency" need not be read as applying exclusively to "Common Element" repairs. Yet, the Association asserts the district court effectively rewrote the operative language of the bylaw to read: "unless required for <u>emergency</u> repair, <u>emergency</u> protection or <u>emergency</u> operation of the Common Elements . . . ." We should not rewrite bylaws in the guise of interpretation.

Under the plaintiffs' interpretation, a minority of owners could block necessary, but nonemergency, expenditures favored by sixty-five percent of the owners to maintain the existing common areas and thereby undermine the board's ability to prevent common areas from

falling into disrepair. *See Schaefer,* 836 A.2d at 756 (favoring a broad view of powers for association because, if the board is "unable to act, the common property may fall into disrepair" (quoting Restatement (Third) of Property § 6.4 cmt. *a,* at 90)).

Plaintiffs contend that past voting practices on major expenditures support their position that the garage repairs required a membership vote. The district court did not rely on the evidence of other votes, but, rather, confined its analysis to the four corners of the bylaws. We can look to the conduct of the parties as placing a practical construction on the meaning of a term. *Van Diest Supply Co.,* 303 F.3d at 837 (citing *Ackerman v. Lauver,* 242 N.W.2d 342, 347 (Iowa 1976)). The record evidence of prior membership votes in this case does not compel acceptance of the plaintiffs' interpretation. The record supports a finding that at least five earlier expenditures for common elements were put to an informal membership vote: three involved repair or replacement of heat exchangers, the fourth was a repair to the garage roof, and the fifth was to enclose balconies. Of course, the fact the board allowed prior membership votes on those matters does not mean it was required to do so. Significantly, these were not formal votes by all members as contemplated in the bylaw, but rather simply a voice vote by those attending the meeting when the board took the action—akin to a plebiscite. Indeed, Oberbillig acknowledged "it clearly was an emergency" when the heat exchanger failed and was replaced at a cost of $380,000. That matter was put to the informal vote even though emergency expenditures are exempt from the two-thirds member preapproval requirement under each side's interpretation of the bylaw.

In any event, other record evidence supports the Association's interpretation. For example, no membership vote was taken when the

board in November 2008 approved nonemergency expenditures for the elevator exceeding the $25,000 threshold. Strong evidence of the practical construction placed on the bylaw by the West Grand Towers unit owners is the fact that the owners of eighty-three out of eighty-seven units voluntarily paid the assessment at issue for the nonemergency garage repairs without a membership vote. In effect, the members voted with their pocketbooks. Owners of ninety-five percent of the common elements effectively approved the board's action by paying the special assessment. That is well above the two-thirds approval required under plaintiffs' interpretation of the bylaw. We view payment by ninety-five percent of the owners as supporting the Association's interpretation.

Moreover, their payment of the assessment may be regarded as a ratification. *See Lanza v. Bd. of Dirs. of Providence Point Umbrella Ass'n*, No. 44947–8–I, 2000 WL 264019, *2 (Wash. Ct. App. Mar. 6, 2000) (subsequent ratification by seven condominium owner associations cured any procedural error when Umbrella Board proceeded with repairs to common area swimming pool); *see also* 7A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 3401, at 5 (Cumulative Supp. 2011–2012) ("While the shareholders cannot by ratification render valid an act that is beyond the powers of the corporation, they may ratify an act that is within its powers but beyond the powers of the directors.").

In an appropriate case, we will construe ambiguous language against the drafter. *Peak*, 799 N.W.2d at 548. This is not such a case. The bylaws and declaration were drafted by the developers, not the Association, which acts on behalf of its members, the condominium owners. Moreover, as we explain below, paragraph 6(g) of the Declaration grants the Association board interpretive authority over the bylaws, which trumps the doctrine of *contra proferentem. See Kimber v.*

*Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999) (doctrine of *contra proferentem* inapplicable when contract vests party with interpretive authority).

We conclude it is ambiguous whether "emergency" modifies solely the term next to it—"repair"—or the entire phrase "repair, protection or operation of the Common Elements . . . ." *See Cairns*, 398 N.W.2d at 824 ("Ambiguity exists if, 'after the application of pertinent rules of interpretation to the face of the instrument, a genuine uncertainty results as to which one of two or more meanings is the proper one.' " (quoting *Fraternal Order of Eagles v. Ill. Cas. Co.*, 364 N.W.2d 218, 221 (Iowa 1985))). To resolve which meaning controls, we must read the bylaws and declaration as a whole and, in so doing, address the board's authority to decide disputes over the interpretation and application of a bylaw. *See Phillips*, 407 N.W.2d at 611 (articles and bylaws to be construed as a whole).

**C. The Board's Interpretive Authority.** We now consider whether to defer to the board's interpretive authority under paragraph 6(g) of the Declaration, entitled "Board's Determination Binding," which provides:

> In the event of any dispute or disagreement between any Unit Owners relating to the Property, *or any questions of interpretation or application of the provisions of the Declaration or Bylaws, such dispute or disagreement shall be submitted to the Board. The determination of such dispute or disagreement by the Board shall be binding on each and all such Unit Owners,* subject to the right of Unit Owners to seek other remedies provided by law after such determination by the Board.

(Emphasis added.) This constitutes an express grant of authority to the board to interpret bylaws and decide disputes over the interpretation and application of bylaws.

We have relied on grants of interpretive authority to administrative agencies to defer to the agency's interpretation of a statute or regulation. *See generally Sherwin-Williams Co. v. Iowa Dep't of Rev.*, 789 N.W.2d 417, 423 (Iowa 2010) (clarifying and refining analysis for "deciding when an agency has been granted interpretative authority with respect to a statute"). Other courts have relied on an association or country club board's equivalent authority to interpret bylaws in resolving disputes with members. *See, e.g., Susi v. St. Andrews Country Club, Inc.,* 727 So. 2d 1058, 1061 (Fla. Dist. Ct. App. 1999) (upholding board's reasonable interpretation; noting "the By-laws do give the Board of St. Andrews the right to interpret the By-Laws and all parts thereof"); *Boca W. Club, Inc. v. Levine,* 578 So. 2d 14, 16 (Fla. Dist. Ct. App. 1991) ("Since the bylaws provide that the Board has the final interpretive authority regarding doubtful or conflicting portions of the bylaws, and their interpretation is neither arbitrary [n]or unreasonable, we will not interfere with its authority to construe them."); *Finn v. Beverly Country Club,* 683 N.E.2d 1191, 1193–94 (Ill. App. Ct. 1997) (upholding board decision based on "the separate bylaw giving the Board the power to interpret the bylaws"). *But see Riverwatch Condo. Owners Ass'n v. Restoration Dev. Corp.,* 980 A.2d 674, 683 n.19 (Pa. Commw. Ct. 2009) (board's interpretive authority in declaration not binding on court). In *Ticor Title Insurance Co. v. Rancho Santa Fe Ass'n*, the court held the board's interpretive authority did not allow it to ignore express language in covenant. 223 Cal. Rptr. 175, 179–80 (Ct. App. 1986).

We agree a grant of interpretive authority in an association's governing documents does not permit its board to violate unambiguous bylaws. We hold that paragraph 6(g) gives the Association board the power to interpret and apply ambiguous bylaws. The district court

erroneously concluded the bylaw unambiguously required a membership vote and therefore did not address the board's interpretive authority. Because we conclude Article V, Section 6 of the bylaws is ambiguous and the board's interpretation is reasonable, we will defer to that interpretation if doing so is consistent with the business judgment rule.

**D. The Business Judgment Rule.** Finally, we consider the application of the business judgment rule. The "heart of the business judgment rule" is "judicial deference to business decisions by corporate directors." Matthew G. Doré, 6 *Iowa Practice: Business Organizations* § 28:6, at 94 (2011 ed.). The business judgment rule applies "[w]hen directors act in good faith in making a business decision, when the decision is reasonably prudent, and when the directors believe it to be in the corporate interest . . . ." *Hanrahan v. Kruidenier*, 473 N.W.2d 184, 186 (Iowa 1991). The rule would not permit directors to violate an unambiguous bylaw; rather, the rule (if applicable) would provide judicial deference to board action authorized by the Association's governing documents.

The district court declined the Association's invitation to apply the rule. We have not previously held whether the rule applies to the actions of the board of a nonprofit condominium owners association. "The business judgment rule, universally applied as a part of corporate law, has long been codified in Iowa." *Hanrahan*, 473 N.W.2d at 186 (citing Iowa Code § 490.830 (1991)). *Hanrahan* applied the rule codified in the Iowa Business Corporation Act, Iowa Code chapter 490. The Association is a nonprofit corporation formed under chapter 504, the Revised Iowa Nonprofit Corporation Act. Section 504.831 contains language identical to section 490.830 codifying the business judgment rule.[4] *Compare* Iowa

---

[4]Iowa Code section 504.831 (2007) provides in pertinent part:

Code § 490.830 (2007), *with id.* § 504.831. Accordingly, the legal predicate exists for applying the business judgment rule to the nonprofit Association board's actions in this case.

Other courts have applied the business judgment rule or its equivalent to uphold the actions of condominium or homeowners association boards. *See, e.g., Lamden v. La Jolla Shores Clubdominium*

---

1. Each member of the board of directors of a corporation, when discharging the duties of a director, shall act in conformity with all of the following:

    *a.* In good faith.

    *b.* In a manner the director reasonably believes to be in the best interests of the corporation.

2. The members of the board of directors or a committee of the board, when becoming informed in connection with their decision-making functions or when devoting attention to their oversight functions, shall discharge their duties with the care that a person in a like position would reasonably believe appropriate under similar circumstances.

3. In discharging board or committee duties, a director who does not have knowledge that makes reliance unwarranted is entitled to rely on the performance by any of the persons specified in subsection 5, paragraph "*a*", to whom the board may have delegated, formally or informally by course of conduct, the authority or duty to perform one or more of the board's functions that are delegable under applicable law.

4. In discharging board or committee duties, a director who does not have knowledge that makes reliance unwarranted is entitled to rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by any of the persons specified in subsection 5.

5. A director is entitled to rely, in accordance with subsection 3 or 4, on any of the following:

    *a.* One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the functions performed or the information, opinions, reports, or statements provided by the officer or employee.

    *b.* Legal counsel, public accountants, or other persons as to matters involving skills or expertise the director reasonably believes are either of the following:

    (1) Matters within the particular person's professional or expert competence.

    (2) Matters as to which the particular person merits confidence.

*Homeowners Ass'n,* 980 P.2d 940, 950 (Cal. 1999) (holding "courts should defer to the board's authority and presumed expertise" when it discharges its duty to repair a common area after a "reasonable investigation, in good faith and with regard for the best interests of the community association and its members"); *Colorado Homes, Ltd. v. Loerch–Wilson,* 43 P.3d 718, 724 (Colo. App. 2001) ("We perceive no reason why [the business judgment rule] should not apply in this case insofar as the issue for resolution is whether the [homeowners association] fulfilled its obligation to enforce the covenants."); *Weldy v. Northbrook Condo. Ass'n,* 904 A.2d 188, 192 (Conn. 2006) (noting the court reviews "whether the [action] reflects reasoned or arbitrary and capricious decision making"); *Papalexiou v. Tower W. Condo.,* 401 A.2d 280, 286 (N.J. Super. Ct. 1979) ("If the [condominium] directors' conduct is authorized, a showing must be made of fraud, self-dealing or unconscionable conduct to justify judicial review."); *Levandusky v. One Fifth Ave. Apartment Corp.,* 553 N.E.2d 1317, 1322 (N.Y. 1990) ("So long as the board acts for the purposes of the cooperative, within the scope of its authority and in good faith, courts will not substitute their judgment for the board's."); *Agassiz W. Condo. Ass'n v. Solum,* 527 N.W.2d 244, 248 (N.D. 1995) ("We hold the business-judgment rule applies to a board's actions regarding repairs to the common areas of a condominium."); *Schwarzmann v. Ass'n of Apartment Owners of Bridgehaven,* 655 P.2d 1177, 1181 (Wash. Ct. App. 1982) ("Absent a showing of fraud, dishonesty, or incompetence, it is not the court's job to second-guess the actions of [condominium] directors."). We hold the business judgment rule as codified in section 504.831 applies to the actions of directors of nonprofit corporations organized under chapter 504.

The business judgment rule is usually applied as a defense to claims a director is personally liable for corporate actions. *See Hanrahan*, 473 N.W.2d at 186. However, without invoking the business judgment rule by name, we refused to enjoin efforts to amend the articles of incorporation of an insurance company over the objection of some of its members. *Wolf v. Lutheran Mut. Life Ins. Co.,* 236 Iowa 334, 341–42, 18 N.W.2d 804, 809 (1945) ("[C]ourts [will not] interfere in the internal management or policy of a corporation except in cases of fraud, bad faith, breach of trust, gross mismanagement or ultra vires acts . . . ."). Our court of appeals, citing *Wolf,* applied the rule by name to affirm an order rejecting a challenge to bylaw amendments. *Cent. Iowa Power Coop. v. Consumers Energy,* No. 06–1060, 2007 WL 2710841, *3 (Iowa Ct. App. Sept. 19, 2007) ("We believe the decision here to amend and tighten the qualifications for membership to the board of directors fits squarely within the protections afforded by the business judgment rule."). Similarly, we conclude the rule applies to the board's exercise of its interpretive authority over the bylaw in this case to proceed with the garage repairs without a membership vote.

We have noted "[t]he purpose of the [business judgment] rule is to severely limit secondguessing of business decisions which have been made by those whom the corporation has chosen to make them." *Hanrahan*, 473 N.W.2d at 186. We will not substitute our judgment for the interpretation of the Association board if the factual predicates for the rule are present. In this case, there is no claim that any of the Association board members were self-dealing or had a conflict of interest. The rule applies when the directors act in good faith and in a manner they reasonably believe to be in the best interest of the corporation. Iowa Code section 504.831(1); *see also Hanrahan,* 473 N.W.2d at 186. The

directors are entitled to rely on the advice of legal counsel on matters within their professional competence. Iowa Code § 504.831(5)(*b*). They did so here, relying on the legal opinion of Attorney Thomas G. Fisher, Sr. that no membership vote was required for the garage repair and assessment.

The board thoroughly investigated the need for repairs to the garage and the proposed special assessments, commissioning studies by engineers and financial experts. The board's deliberations spanned several years and numerous board meetings to which members were invited. The board secured multiple estimates and firm bids before contracting for the repairs. Plaintiffs do not challenge the necessity for the repairs or the reasonableness of the ultimate cost. The challenge concerns only the lack of a vote of preapproval by two-thirds of the membership. We conclude substantial evidence supports the factual predicates for the business judgment rule reflected in the district court's findings:

> There is no doubt that the Board was open and honest with its members in addressing the necessity of repairs to the garage. There were several meetings where the repairs and the costs regarding same were discussed where members were allowed to voice their opinions. There was nothing clandestine in the way the Board handled bringing this matter to the membership.
>
> While the court agrees with the Association's analysis of the record that shows the directors acted in good faith, the decision was reasonably prudent and that the Board believed the decision to be in the corporate interest . . . .

The district court stopped short of applying the business judgment rule because it concluded the rule does not permit the board to disregard a bylaw the court found unambiguously required the membership vote. As explained above, we believe the bylaw is ambiguous, and the board

properly exercised its authority to interpret the bylaw. We apply the business judgment rule to defer the board's interpretation. Accordingly, we hold the board was entitled to proceed with the garage repairs and special assessment without the preapproval of two-thirds of the membership. We therefore do not need to reach the issue of laches.

### IV. Disposition.

For these reasons, we reverse the ruling of the district court and remand for entry of judgment in favor of the Association dismissing plaintiffs' declaratory judgment action and entering judgment against plaintiffs on the counterclaim for their respective shares of the special assessment including interest. The district court shall determine the reasonable attorneys fees incurred by the Association (including appellate fees) in this litigation and enter judgment in its favor and against plaintiffs, jointly and severally, for those fees and costs.

**REVERSED AND REMANDED.**

All justices concur except Wiggins and Mansfield, JJ., who take no part.