# IN THE COURT OF APPEALS OF IOWA

No. 13-1776
Filed November 26, 2014

**GRANT INSURANCE AGENCY, INC.,**
**RICHARD A. GRANT, and ELLEN**
**K. GRANT,**
      Plaintiffs-Appellees,

**vs.**

**CLEM INSURANCE SERVICES, INC.,**
**d/b/a BROOKS-LUSSEM INSURANCE,**
**INC., ANTHONY S.CLEM, and ANNE M.**
**CLEM,**
      Defendants-Appellants.

_____

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

Buyers of an insurance agency appeal the judgment entered in favor of the sellers on several contract claims. **AFFIRMED AND REMANDED WITH DIRECTIONS.**

Erin M. Carr of Carr & Wright, P.L.C., Des Moines, for appellants.

Kevin Cunningham, Cunningham & Kelso, P.L.L.C., and Chip Lowe, Urbandale, for appellees.

Heard by Mullins, P.J., and Bower and McDonald, JJ.

**MULLINS, P.J.**

Buyers of an insurance agency appeal the judgment entered in favor of the sellers on several contract claims. They contend the district court erred in failing to find the sellers breached the purchase agreement, in interpreting the contract, and in awarding the sellers liquidated damages and attorney fees. We affirm the district court in all respects and remand for a determination of the amount of sellers' appellate attorney fees to be awarded.

## I. BACKGROUND FACTS AND PROCEEDINGS.

Richard Grant has been a licensed insurance agent since 1974. In the 1990s, he and his wife, Ellen, founded Grant Insurance Agency (GIA), an independent insurance agency. During the course of business, GIA developed a book of business customers who regularly purchased policies.

By the end of 2006, the Grants began looking for a buyer to purchase GIA's book of business. Anthony Clem, an insurance agent and owner of Clem Insurance Services, Inc. (CIS), contacted the Grants about acquiring GIA and its book of business. After successful negotiations, the parties entered into an asset purchase agreement on January 4, 2007. The agreement provides that CIS, Clem, and his wife, would purchase GIA for the sum of $519,105. Of that sum, $275,000 was to be paid in cash at the time the agreement was entered, and the remaining $244,105 plus interest was to be paid in quarterly installments of $13,749.53. The agreement states that the buyers were to pay to the sellers all "profit-sharing/contingent commissions" earned on GIA's policies purchased under the agreement for the 2007 calendar year, up to a maximum of $30,000.

Additionally, the buyers agreed that CIS would employ Grant as an insurance agent for five years with an annual salary of $75,000, plus half the commissions on all new business he generated. The buyers were also to pay the premiums on Grant's long-term care policy until he reached the age of sixty-five. Grant was then prohibited from directly or indirectly engaging in any other insurance agency business for a period of ten years and within a fifty-mile radius of the area GIA sold insurance within the year prior to entering the purchase agreement.

GIA employed John Benda as an insurance agent. In the late 1990s, GIA purchased a book of business from Benda and in return Benda became a minority stockholder of GIA, with a fifteen percent ownership interest. The buyers contend they had no knowledge of Benda's ownership interest, even though the first page of the agreement lists Benda as one of GIA's shareholders and he signed the agreement as a "seller."[1]

The agreement provided that CIS would employ Benda for two years, and in addition to a base salary, Benda would receive half the commissions on any new business he generated during that period. After the buyers purchased GIA, Clem alleges Benda "was not keeping up with the technology part of our business." Benda worked for CIS until he underwent quadruple bypass surgery in April 2007. He was on medical leave until his doctor approved him to return to part-time work on June 1, 2007. CIS terminated Benda's employment on the same day.

---

[1] At the closing of the sale, the Grants gave Benda a check for $60,000 to compensate him for his ownership interest in GIA. The buyers were present.

While it was operating, GIA also had an arrangement with insurance agent David Hurkin. GIA allowed Hurkin to use its agent of record status to provide insurance coverage with certain companies for three of his clients. In exchange, Hurkin paid GIA half of his commissions on those accounts. While Clem admits Grant mentioned such accounts existed, he testified he was unaware they included one of GIA's largest accounts. Clem alleges he included the full commission for that account in calculating a purchase price and did not become aware that Hurkin would be receiving half the commission until April 2007. Clem negotiated a different arrangement for 2008 and thereafter, with Hurkin receiving thirty-eight percent of the commission and CIS receiving sixty-two percent.

Prior to the sale, Clem believed GIA's 2007 revenue would be $305,000. Clem later calculated the actual revenue attributable to GIA's book of business for 2007 was $251,000. Clem attributes the loss in expected revenue to be attributable to accounts lost when Benda was terminated and profits counted on the books that were split with Hurkin. Beginning with the third or fourth installment payment, the buyers began paying a quarter late. Although dental insurance premiums were withheld from Grant's salary, no such insurance coverage was ever obtained. Clem was displeased that the business was performing below his expectations, so the buyers stopped paying the premiums on the Grants' long-term care coverage, which led to cancellation of the coverage. The contingent commissions were not paid, and only $3256.07 in new-business commissions were paid. The buyers never made the last of the installment payments due under the agreement.

On March 23, 2012, the sellers filed an action against the buyers, alleging the following causes of action: breach of contract, recovery of wages and compensation, foreclosure of security agreement, and declaratory judgment. The buyers answered on May 11, 2012, denying the sellers' claims and asserting a breach-of-contract counterclaim. A bench trial was held in November 2012.

The district court entered its ruling on May 10, 2013. With regard to the credibility of the parties, the court found:

> Mr. Clem's testimony was frequently internally inconsistent, contradictory, and self-serving. The testimony of Mr. and Mrs. Grant was consistent, both individually and collectively. The Grants did not contradict themselves or each other. The court finds the Grants are credible and believable while Mr. Clem lacks credibility. To the extent the parties disagree as to the facts of this case, this court is inclined to trust the Grants and not Mr. Clem.

It then found in favor of the sellers on each of their claims. It awarded the sellers the final installment payment due under the sales agreement in the amount of $13,749.53, unpaid contingent commissions in the amount of $30,000, the cost of replacing the Grants' long-term care insurance in the amount of $51,105.09, reimbursement dental care expenses in the amount of $1500, unpaid new-business commissions in the amount of $27,151.63, liquidated damages in the amount of $27,151.63, the declaratory relief requested, and all of the sellers' attorney fees and costs in the amount of $21,466.51.

## II. STANDARD OF REVIEW.

A contract action is generally treated as one at law. *Van Sloun v. Agans Bros. Inc.*, 778 N.W.2d 174, 178 (Iowa 2010). If both legal relief and equitable relief are demanded, the determination of how to classify the action turns on what

appears to be its primary purpose or the controlling issue. *Id.* at 179. Where the basic rights of the parties derive from the nonperformance of a contract, the remedy is monetary, and the damages are "full and certain," the action is considered at law. *Id.*

This is an action at law. Accordingly, we review for errors at law. *Id.* The trial court's findings carry the force of a special verdict and are binding if supported by substantial evidence. *Id.* Because the trial court has a better opportunity to evaluate witness credibility, disputes weighing heavily are best resolved by the trial court. *Tim O'Neill Chevrolet v. Forristall*, 551 N.W.2d 611, 614 (Iowa 1995). However, we are not bound by the court's legal conclusions. *Van Sloun*, 778 N.W.2d at 179.

## III. DISCUSSION.

The buyers raise four arguments on appeal. First they contend the trial court erred in denying its claim the sellers breached the purchase agreement. They also contend the court erred in interpreting the clause regarding the new-business commissions Grant was to receive. The buyers contend the court erred in awarding liquidated damages because the failure to pay the new-business commissions was made in good faith. Finally, the buyers contend the court erred in awarding the sellers' attorney fees for the entire action.

### A. Breach of Contract by Sellers.

The buyers first contend the district court erred in denying their counterclaim for breach of contract. In order to succeed on a breach of contract claim, a party must show:

(1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Mortgage Center, L.L.C. v. Baccam*, 841 N.W.2d 107, 110-11 (Iowa 2013).

Where a party fails to perform any promise that forms a whole or a part of the contract, a breach of contract occurs. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998).

The buyers' breach-of-contract counterclaim stems from the purchase agreements' disclosure provision, which states:

> **4.1.15 Full Disclosure.** No representation or warranty by Seller in this Agreement nor in any certificate, schedule, exhibit, letter or other instrument furnished or to be furnished to Buyer or its representatives pursuant hereto, or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make the statements contained therein not misleading. *There is no information of a material nature concerning the Assets or the business, operations, customers, or employees of Seller which has not heretofore been disclosed to Buyer or its representatives in writing.*

(Emphasis added.) The buyers argue the sellers breached the agreement by failing to disclose certain business agreements in writing. Specifically, the buyers allege the sellers failed to disclose in writing the agreement to split commissions with David Hurkin on three accounts and David Benda's ownership interest in GIA.

**1. The Hurkin Agreement.**

The district court found the sellers did disclose the agreement with Hurkin to split commissions on certain accounts. Clem admitted he had knowledge of

GIA's arrangement with Hurkin. Grant testified that he and Clem talked about the arrangement "several times" during the months of negotiation. Grant testified, "I told him going in, there were three accounts that we didn't control. I didn't know how long they would stay with us and they didn't have to stay with us. But I explained the agreement, the oral agreement that I had with Mr. Hurkin." We find substantial evidence supports the district court's finding.

The buyers note the disclosure was not made in writing. However, the purchase agreement only requires written disclosure of "information of a material nature." The buyers claim the Hurkin agreement was material to valuing the business and determining a purchase price. Clem testified he did not understand which of GIA's accounts the Hurkin agreement pertained to or the size of the commissions that would be split. Because he did not have this information, Clem testified he could not make an "accurate assessment of [GIA's] actual revenue," which was necessary when negotiating a purchase price.

Information is material if it is "[o]f such a nature that knowledge of the [information] would affect a person's decision-making process." Black's Law Dictionary 991 (7th ed. 1999). Material information is "essential" or "significant." Black's Law Dictionary 991 (7th ed. 1999); *see also Pavone v. Kirke*, 801 N.W.2d 477, 487 (Iowa 2011) ("Terms are material if they are significant to the contract.").

Like the district court, we conclude the buyers failed to prove the Hurkin agreement was material. Hurkin's share of the commissions received under the agreement was approximately $8000 per year—less than three percent of the

$305,000 in revenue Clem anticipated earning from GIA's book of business.[2] This amount is not so great as to be considered essential or significant to the business. Although Clem testified that knowing which accounts and commissions were affected by the agreement would have influenced his decision-making process, the district court found Clem was not a credible witness because his testimony was "self-serving," and we defer to this finding. Clem did know of the agreement and that it affected three accounts that could "leave" the business at any time. We further note that the buyers were not bound by the agreement between Hurkin and GIA as is evidenced by Clem's testimony that he later negotiated a more favorable split of commissions with Hurkin.

### 2. Benda's Ownership Interest.

The buyers also argue the sellers breached the purchase agreement by failing to disclose Benda's ownership interest in GIA in writing. However, their argument has little to do with the fifteen percent ownership interest Benda retained in GIA until its sale. Rather, their argument concerns the book of business that Benda sold to GIA in exchange for that ownership interest approximately one decade before the purchase agreement was entered. The buyers complain they mistakenly believed Benda was "fairly insignificant" to GIA's profitability, and that if they had known Benda had generated part of GIA's book of business, they would have "taken proactive steps to retain [his] clients."

---

[2] Grant testified Hurkin received around $8000 per year in commissions from these accounts, an amount slightly lower than the buyers claim in damages for the pertinent years. However, the specific amount of revenue the buyers claim they lost—$9115.44 in 2007 and $8545.44 in 2008—is also less than three percent of the anticipated revenue from GIA's book of business.

The district court properly characterized this argument as "unconvincing at best and, at worst, absurd."

Substantial evidence supports the finding that the buyers knew of Benda's ownership interest in GIA from written statements, discussions, and the surrounding circumstances. The purchase agreement lists Benda as one of the "shareholders, officers and directors" of GIA. Benda was at the closing and signed the purchase agreement as a party to the agreement. At the closing, the Grants paid Benda for his share of the GIA stock. Clem admitted he knew Benda was a shareholder of GIA. Benda testified he discussed his ownership interest in GIA with Clem. When asked if he ever told Clem that Benda owned fifteen percent of GIA, Grant testified, "I certainly did." The buyers have failed to prove the sellers breached the purchase agreement.

Furthermore, there is also ample evidence that the buyers knew or should have known of Benda's value to the business. Clem agreed that Benda's two-year employment agreement was included in the purchase agreement so that the clients with whom he had developed relationships with over the years would stay with the business and continue to generate commissions. It is a matter of common sense that a salesperson who has been with a company for some period of time would have developed relationships with the clients with whom the salesperson interacted and that those relationships give the salesperson a business advantage. Still, the buyers took no action to retain Benda's clients while he was on leave from work due to his health. CIS then terminated his employment on his first day back to work. It is disingenuous to claim the sellers'

failure to state the obvious caused the buyers' damage rather than the buyers' own bad business decisions.

### B. Contract Interpretation.

The buyers also contend the district court erred in interpreting the contract provision relating to new-business commissions. That particular provision states that Grant "will receive a commission split of fifty percent (50%) on all new business generated by him during said five (5) year period." The buyers argue the term "new business" excludes new policies generated by existing customers and only includes commercial business.

The district court interpreted the phrase "new business" to mean new policies generated by new and existing customers, regardless of whether they are commercial or noncommercial. Although this definition does not include policy renewals, the court noted it could think of "no reasonable basis for excluding business supplying new revenues simply because it involves an existing customer." The court also noted the only evidence in the record to suggest the commissions were only intended for commercial business was Clem's testimony; given the court's concerns with his credibility, this evidence was discounted.

In interpreting a contract, we determine the meaning of the contract words. *Rick v. Sprague*, 706 N.W.2d 717, 723 (Iowa 2005). We are bound by what the contract says except in cases of ambiguity. *RPC Liquidation v. Iowa Dep't of Transp.*, 717 N.W.2d 317, 321 (Iowa 2006). The test for ambiguity is whether the language is susceptible to two interpretations. *Oberbillig v. West Grand Towers*

*Condo. Ass'n*, 807 N.W.2d 143, 150 (Iowa 2011). When a contract is not ambiguous, it is "a fundamental and well-settled rule" that we must simply interpret it as written. *Smidt v. Porter*, 695 N.W.2d 9, 21 (Iowa 2005).

The term "new business" is not ambiguous. The word "business" is defined as "a usual commercial or mercantile activity engaged in as a means of livelihood," "a commercial or sometimes an industrial enterprise," or "dealings or transactions especially of an economic nature." Merriam–Webster's Collegiate Dictionary 167 (11th ed. 2006). Here, the business is the sale of insurance policies. The word "new" means "having recently come into existence." Merriam–Webster's Collegiate Dictionary 834 (11th ed. 2006). Therefore, the term "new business" would be those insurance policies that have recently come into existence, rather than those that have been in existence and were simply renewed.

The contract does not provide any limitation on the type of new business for which Grant is eligible to receive commissions. Rather, the use of the word "all" in "all new business" indicates the contrary is true.[3] Therefore, the contract, as written, provides that Grant would receive commissions on all new policies sold, regardless of whether the customer is new or existing, or whether the policy is commercial or noncommercial. We find no error in the court's interpretation.

---

[3] "All" in this context means "the whole number, quantity, or amount." Merriam–Webster's Collegiate Dictionary 31 (11th ed. 2006).

### C. Liquidated Damages.

The buyers next contend the court erred in awarding the sellers liquidated damages under Iowa Code chapter 91A (2011) for the buyers' failure to pay new-business commissions. Section 91A.8 states:

> When it has been shown that an employer has intentionally failed to pay an employee wages or reimburse expenses pursuant to section 91A.3, whether as the result of a wage dispute or otherwise, the employer shall be liable to the employee for any wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages and determined to have been usual and necessary.

The buyers argue their failure to pay the new-business commissions was not intentional and was done in good faith.

Chapter 91A distinguishes between intentional and unintentional failure to pay wages, only allowing liquidated damages for intentional failure to pay wages. *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 597 (Iowa 1999). Liquidated damages are not available if an employer maintains a good faith dispute over the amount of wages owed. *Id.* at 598. The question here is whether the buyers' failure to pay the commissions due was a result of a good faith dispute over the amount of wages owed.

The district court found the buyers' failure to pay new-business commissions was "[u]nquestionably" willful and intentional. We find the record supports this determination. Clem admits he stopped paying the Grants' long-term care policy because he was unhappy with the business's performance. The buyers failed to pay $24,439.43 of the contingent commissions they admitted they owed Grant under the purchase agreement. They also failed to make the

final installment payment under the contract. While the buyers initially paid Grant the new-business commissions, they failed to pay more than $3256.07 of the $30,000.00 owed. When Grant approached Clem about the money the buyers still owed under the contract at the end of 2011, Clem stated he was not going to pay those amounts because he "lost money on" Benda and "he was going to take that from what he owed [the sellers]." Grant testified that he asked Clem if he felt the sellers had given him false information, falsified any records, or were dishonest, and Clem answered, "No. . . . I made a bad deal." In light of the evidence and the court's credibility determination, the buyers' failure to pay Grant the new-business commissions owed can be fairly viewed as willful and intentional.

### D. Attorney Fees.

Finally, the buyers contend the court erred in awarding the sellers' attorney fees. They argue that attorney fees are only available under section 91A.8, not for pursuit of all the sellers' claims.

The district court initially awarded the sellers' attorney fees "incurred in recovering . . . unpaid commissions on new business generated" and ordered the sellers to make a written application for those fees. The sellers did not request the court revisit its ruling in a post-trial motion, but submitted an application for attorney fees for the total amount incurred in pursuit of all of the claims brought against buyers in the amount of $21,466.51. In its ruling on the attorney fee application, the court sua sponte revisited its ruling and determined it was permitted to award sellers' attorney fees on all claims.

The purchase agreement states in pertinent part:

> **7.2 INDEMNIFICATION BY BUYER.** Buyer shall defend, indemnify and hold Seller harmless from and against any and all liabilities, losses, damages, claims and expenses, including reasonable attorneys' fees, arising in connection with or resulting from any breach of warranty, misrepresentation or non-fulfillment of any agreement on the part of Buyer under this Agreement.

Based on this provision of the purchase agreement, we find the sellers were entitled to an award of attorney fees related to all claims arising from the purchase agreement. Accordingly, we affirm.

### E. Appellate Attorney Fees.

The sellers seek an award of their appellate attorney fees under both section 91A.8 and paragraph 7.2 of the purchase agreement.

"When judgment is recovered upon a written contract containing an agreement to pay an attorney's fee, the court shall allow and tax as a part of the costs a reasonable attorney's fee to be determined by the court." Iowa Code § 625.22. The sellers have the burden of proving the services were reasonably necessary and that the charges were in a reasonable amount. *See Ales v. Anderson, Gabelmann, Lower & Whitlow, P.C.*, 728 N.W.2d 832, 842 (Iowa 2007). In making this determination, the court must consider "the time necessarily spent, the nature and extent of the service, the amount involved, the difficulty of handling and importance of the issues, the responsibility assumed and results obtained, the standing and experience of the attorney in the profession, and the customary charges for similar service." *Id.*

The same rationale that justifies awarding attorney fees under section 625.22 below justifies awarding attorney fees in this appeal. *See Bankers Trust*

*Co. v. Woltz*, 326 N.W.2d 274, 278 (Iowa 1982) (holding an award of appellate attorney fees was appropriate under section 625.22 "where the written agreement provided for attorney fees and in no way limited them to costs in the trial court"). Because the appellate courts prefer the district court to determine the reasonable amount of attorney fees to be awarded on appeal, we remand the case to the district court for the limited purpose of an evidentiary hearing on and the fixing of appellate attorney fees. *See id.* (citing numerous cases where this method of calculating appellate attorney fees has been employed); *see also Schaffer v. Frank Moyer Const., Inc.*, 628 N.W.2d 11, 24 (Iowa 2001) (noting the district court "is an expert on the issue of reasonable attorney fees" and, having had the benefit of observing the trial and post-trial proceedings, is in an ideal position to judge the necessity of time and effort spent by counsel and the rationality of the relationship between the services rendered, the causes of actions, and other matters involved in the case).

**AFFIRMED AND REMANDED WITH DIRECTIONS.**