# IN THE COURT OF APPEALS OF IOWA

No. 18-0842
Filed November 27, 2019

**NORTH SKUNK RIVER GREENBELT ASSOCIATION, INC.,**
    Plaintiff-Appellee,

**vs.**

**SCOTT ALLEN, TRAVIS YEGGY, MIKE RIDDLE, STEPHEN L. MAXON as Administrator of the DORIS E. PARK ESTATE, IRMA ALTENHOFEN, and FRIENDS OF BUNKER MILL BRIDGE, INC. (a/k/a FRIENDS OF BUNKER MILL BRIDGE/FRIENDS OF BUNKER MILL BRIDGE ASSOCIATION),**
    Defendants/Third-Party Plaintiffs-Appellants,

**vs.**

**JULIE BOWERS, as Executive Director of NORTH SKUNK RIVER GREENBELT ASSOCIATION, INC.,**
    Third Party Defendant-Appellee.
_____

Appeal from the Iowa District Court for Washington County, Randy S. DeGeest, Judge.

The defendants appeal a bench ruling denying their claims and concluding they were not entitled to indemnification. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Siobhan Briley of Pugh Hagan Prahm PLC, Coralville, for appellants.

Lanny M. Van Daele of Van Daele Law, LLC, North Liberty, for appellees.

Heard by Bower, P.J., and May and Greer, JJ.

**GREER, Judge.**

### I. Background Facts and Proceedings.

This is a classic case in which failed corporate governance led to distrust, dissention, and disorganization. With all the best intentions aside, had these two nonprofit entities followed corporate principles and practices likely no lawsuit would have been filed. It all started in August 2013 when an arsonist burned and badly damaged the Bunker Mill Bridge, a historic bridge near Kalona, Iowa. When the Washington County Board of Supervisors announced its intention to demolish the bridge, Scott Allen, Doris Park,[1] and several other local residents loosely formed Friends of Bunker Mill Bridge (FBMB) in an attempt to save the bridge.[2] The North Skunk River Greenbelt Association, Inc. (NSRGA), an Iowa nonprofit corporation with a goal of saving historic bridges, learned of FBMB's efforts to save the Bunker Mill Bridge and wanted to help.

To make that connection, in September 2013, Julie Bowers, NSRGA's executive director, attended a town hall meeting in Kalona and offered NSRGA's support and fiscal sponsorship to FBMB's efforts to save and restore the bridge. NSRGA/Workin' Bridges and FBMB signed collaboration agreements.[3] Because FBMB was not a legal entity, NSRGA registered FBMB as a trademark to help with community recognition and because the bank required that designation to deposit checks made to FBMB.

---

[1] Park passed away during the pending litigation. Her estate was substituted as a party.
[2] Although not incorporated until 2017, FBMB functioned with officers and held meetings. At one point, Allen acted as "executive director" of FBMB. Defendants described it as an unincorporated nonprofit association under Iowa Code chapter 501B (2013).
[3] "Workin' Bridges" appears in construction contracts as a division of NSRGA and, along with construction costs, paid consulting fees to Bowers.

With a plan for the bridge restoration in place, the Washington County Board of Supervisors agreed to transfer ownership of the bridge to FBMB and NSRGA, vacate existing easements with adjoining landowners to allow the easements to be granted to FBMB and NSRGA, and donate $80,000 to FBMB in earmarked demolition funds in two installments to help with the renovation efforts. Although the collaboration agreement referenced setting up a Kalona bank account for FBMB and transparency in accounting practices, NSRGA deposited some bridge funds in its own bank account in Grinnell. FBMB had no access to the Grinnell account. Along the way, FBMB also gathered $46,000 in donations, which it added to the bridge restoration effort and deposited into its Kalona account.

Once the county deeded the bridge to NSRGA and FBMB, it became private property. For that reason, the county no longer required roads to the north and south of the bridge, and moreover it did not want a public road across a private bridge for liability reasons. When the county vacated the road to the north and south of the bridge, this land became the fee simple property of the adjacent landowners. As a part of that grant of land, the county required those landowners to negotiate easements with NSRGA and FBMB to allow bridge access.[4] Bowers, on behalf of NSRGA, and with some members of FBMB, negotiated with Rodney Stumpf, the adjoining landowner to the south of the bridge, a right to install a fence

---

[4] The required access easement granted to both NSRGA and FBMB included "the area from the end of the Bunker Mill Bridge at the abutment, east 30' from edge then south 30', back 75' west then north 30' to waterline, back 45' to point of origin" and specifically provided that the grantor "will at no time block said access easement, thereby preventing access by Grantee to Grantee's real estate."

between his property and the bridge, which impaired access to the bridge from the south.

At first, FBMB generally supported Bowers and NSRGA, but this support eroded over time. One of the main causes of friction between the groups was Bowers's poor recordkeeping and financial management skills. In late 2013, FBMB asked Bowers to provide an accounting to show how the money from the county was being spent. Bowers refused. This caused tension among FBMB's members, leading some to resign. Through all of this tension, FBMB members Allen and Park continued their support of Bowers. To help with the negative public relations, in January 2014, Bowers encouraged Allen and Park to join the NSRGA board of directors and lead a new FBMB committee within NSRGA to provide more "transparency" about NSRGA's finances and to act as liaisons between the two groups and the community. Allen and Park were duly elected to NSRGA's board on January 23.

By April 2014, almost all of the $126,000 generated for the bridge restoration had been spent, but the bridge construction was far from complete. The project remained at a standstill for most of 2014 and 2015. At the end of 2015, NSRGA developed a plan to finally complete the bridge project. NSRGA suggested the FBMB committee raise $20,000 and NSRGA would contribute another $20,000 to complete the bridge project. Once the funds were raised and the work was complete, NSRGA planned to transfer ownership of the bridge to a newly organized FBMB as a separate nonprofit. The FBMB trademark would also be transferred to the new entity. In spite of this plan, NSRGA alleges the FBMB

committee only raised $2000 and NSRGA spent about $50,000 to finish the project.

In late 2015, another NSRGA board member resigned. The board generally accepted the resignation but did not identify a replacement until early 2016, when Bowers invited her daughter, Laran Bowers, to join the board. No NSRGA minutes reflect an election or approval of Laran to the board in early 2016, but Bowers added her to the NSRGA board's Facebook page. Bowers invited her friend Anna Sutherland to join the NSRGA board in April 2016, yet there was no formal vote or documentation of a vote until September 2016.

The bridge construction was completed in March 2016. It was at this tipping point that a dispute about adjoining landowner Stumpf's planned fence construction arose between Bowers and the defendants. Allen and Park requested documentation for approval of a fence that would block access to the bridge. Bowers provided them with the easement agreement between the landowner with NSRGA and FBMB.[5] After reviewing the filed document, the defendants disagreed that the easement agreement created a legal right to build a fence that would block access to the bridge.[6] Yet, on at least two occasions, FBMB leadership orally confirmed the arrangement—both by actions and by words.[7] The defendants believed erecting a fence would prevent the public from using the bridge and

---

[5] Stumpf's easement grant to NSRGA/FBMB also referenced "a permanent access easement over and across the real estate owned by grantor, via the lane running southward from the County road known as Nutmeg Avenue following the real property on the site 33' from the centerline, situated in Washington County, Iowa."

[6] No signatures appeared on the writing other than Stumpf's and the only notation related to the fence was: "[f]ence to be no less/more than 30' from south side of bridge."

[7] One FBMB member spoke to the supervisors in support of blocking the south entrance at Stumpf's property and another helped define the fence location with spray paint.

destroy the goodwill FBMB had created in the community around the bridge restoration. These defendants were also concerned that NSRGA's and FBMB's board had not approved construction of or payment for the fence. The fence was not included in the estimates, progress reports, scope-of-work documents, or project summaries for the bridge. This dispute fractured the relationships between the remaining FBMB members in NSRGA and Bowers in particular.

Between March 26 and April 1, Allen, Park, and another defendant, Travis Yeggy, sent multiple emails to Bowers explaining why they did not believe either NSRGA or FBMB had a legal obligation to build the fence. Nevertheless, Bowers insisted the fence would be constructed. During a phone call, Allen yelled that he was "going rogue" to stop Bowers from building the fence. He contacted a representative of the fence company to convince the company that constructing the fence was illegal because the board had not approved the construction and it would violate the easement agreements. In a last-ditch effort to prevent the fence construction, Allen and Yeggy parked their cars in the easement area to prevent the construction company from accessing the bridge to install the fence. Eventually a construction company representative contacted the Washington County Sheriff who asked Allen and Yeggy to move their cars, and they complied. Construction of the fence was completed on May 9.

After the "rogue" activity, on September 8, NSRGA had its first meeting of the year—a special meeting to remove Allen and Park as directors.[8] Two directors

---

[8] In early 2016, Bowers blocked Allen and Park from the NSRGA Facebook page where she claimed all board activity occurred. After allowing them access for 48 hours in May 2016, she noted in a post: "I know that we never did a formal vote on removing the reps to the board from FBMB—Scott and Doris, although I did my usual asking around before

voted to remove. Allen and Park believed they could not vote, but the meeting minutes state that they voted against removal. Bowers abstained. Laran and Sutherland voted to remove even though, as the defendants argue, they had not been properly elected to the board. Allen and Park orally and in writing dissented from the results of the meeting listing a number of reasons. Three days later, NSRGA did a "clean-up operation" where it recognized Laran's and Sutherland's previous election to the board.

With that factual history in mind, we summarize the proceedings. To start, in June 2016, NSGRA applied for a temporary and permanent injunction against the individual defendants—Allen, Yeggy, Riddle, Park, and Altenhofen—to prevent them from entering the easement area at the bridge, and asked for the return of NSRGA's property and money. In July, the defendants filed a motion to dismiss, arguing that Allen and Park had not been removed from NSRGA's board, that Bowers lacked standing to sue without the approval of a majority of NSRGA's board, and that the individual defendants could not be held liable because they were all volunteers. The district court denied the defendants' motion to dismiss. Then, defendants answered in August, raised a number of affirmative defenses, and counterclaimed for indemnification and for damages based on a breach of fiduciary duty theory. NSRGA answered, denying all claims. In a third-party petition, the individual defendants added Bowers to the suit, both as an individual and in her official capacity as executive director of NSRGA, alleging a breach of her fiduciary duty.

---

removing them from our page and our list. This is a formal vote now so check in below . . . ."

On February 4, 2017, the parties entered into a consent decree, wherein the defendants voluntarily agreed to be temporarily enjoined and to return specific NSRGA property. Through a separate action filed in Polk County, defendants sought judicial dissolution of NSRGA. The Polk County case was voluntarily dismissed so the defendants could bring the claims in this Washington County action.

On March 10, NSRGA moved to amend the petition to address newly discovered facts, add FBMB as a potentially liable party, and add twelve additional counts against all defendants: temporary and permanent injunction, reformation, quiet title, dissolution, breach of contract, co-tenants/tenants in common contribution, equitable compensation, unjust enrichment, trademark infringement, judicial removal of directors, breach of director's standard of conduct, and breach of fiduciary duties.

The defendants filed a motion to dismiss the amended petition, which was denied. In their answer to the amended petition, defendants raised the judicial dissolution of NSRGA but also added counterclaims about fraudulent inducement, breach of contract, intentional interference with business relations, conversion, fraudulent transfer, indemnification, ultra vires acts, breach of fiduciary duty, and conflict of interest. The defendants asserted that NSRGA misappropriated $19,500 of the bridge project funds and applied them to other, unrelated projects without FBMB's consent or knowledge. The defendants further alleged that Bowers wrote several checks to herself, withdrew thousands of dollars in cash from the account, and used NSRGA money to pay for personal traffic fines and personal expenses.

In January 2018, NSRGA moved for summary judgment on all claims, and the defendants moved for summary judgment on all of NSRGA's claims and on some of defendants' counterclaims. The defendants also sought sanctions against NSRGA and its counsel. In February, the court denied the defendants' motion for summary judgment in full and granted NSRGA's motion in part. The court determined that Park and Allen were properly removed as board members of NSRGA and therefore lacked standing to bring the indemnification, ultra vires acts, judicial dissolution, breach of fiduciary duty, and conflict of interest counterclaims. The court dismissed these claims. The court did not address the request for sanctions.

Before trial, the defendants filed a motion to reconsider the ruling on the indemnification counterclaim. The district court reversed its ruling and also considered these other claims at trial: fraudulent inducement, breach of contract, intentional interference, conversion, and fraudulent transfer. NSRGA's remaining claims remained viable but for the request for injunction.[9]

A four-day, non-jury trial was held from February 27 through March 2. After the trial, the parties submitted posttrial motions and proposed findings of fact and conclusions of law.

On March 23, the district court entered its findings of fact and conclusions of law. To begin, the court confirmed that the Allen and Park removals were valid and for good cause and that NSRGA and FBMB legally contracted with Stumpf for a fence. Finding that Bowers "only barely followed the rules," the court found no

---

[9] NSRGA withdrew claims for injunctive relief during trial.

bad intentions or ill motive on her part and that any violations of accepted standards were minimal. As for the relief requested by NSRGA,[10] the court denied its claim to title in the bridge and transferred ownership of the bridge and the FBMB trademark to the newly incorporated FBMB. Based on NSRGA's recordkeeping, the court found that it failed to prove it was entitled to anything from these defendants. Thus, the court denied the request for the return of property and donor recognition items, awarded no funds to NSRGA, and denied NSRGA's claims for breach of contract, equitable contribution, and unjust enrichment.

As to defendants' theories of recovery, the court declined relief for breach of contract, fraudulent inducement, intentional interference, and conversion. The court denied Allen and Park indemnification. Finally, the court awarded FBMB funds held in trust by its counsel and equally split court costs among the parties. The court did not address the request for sanctions.

The defendants filed a motion to reconsider and referenced the failure to award sanctions among other issues. The motion was denied. The defendants appeal, but NSRGA does not.

**II.  Standard of Review.**

The district court tried this case in equity. On appeal, we review a case in the same manner it was tried before the district court. For that reason, we review the issues de novo. Iowa R. App. P. 6.907; *Schildberg v. Schildberg*, 461 N.W.2d 186, 190 (Iowa 1990). In our de novo review, we examine both the facts and the law and decide the issues anew. *SDG Macerich Props., L.P. v. Stanek Inc.*, 648

---

[10] The parties negotiated a consent decree resolving the temporary injunction matter before trial. The permanent injunction request was withdrawn at trial.

N.W.2d 581, 584 (Iowa 2002). We give weight to the district court's fact findings, especially those assessing witness credibility, but we are not bound by them. *Id.*; *see also Jochimsen v. Wapsi Hunting Club, Inc.*, No. 10-1430, 2011 WL 2695272, at *4 (Iowa Ct. App. July 13, 2011). The parties both agree on this standard of review.

### III. Analysis.

The defendants raise the following issues on appeal: (1) whether Allen and Park are entitled to mandatory or permissive indemnification as directors of NSRGA based on NSRGA's bylaws and on Iowa law; (2) whether the defendants proved NSRGA and Bowers converted FBMB funds; (3) whether the defendants have standing to argue that NSRGA should be judicially dissolved; and (4) whether the court should impose sanctions on NSRGA and its counsel. We will address each issue below, but because many issues turn on the director status of Allen and Park in NSRGA, we first address that determination.

**A. Director Status of Park and Allen.** In the ruling on defendants' application for injunctive relief, the district court found that NSRGA legally removed Park and Allen from the board on September 8, 2016. After four days of trial, the court also confirmed that the board action to remove Park and Allen complied with the law and was for good cause. On the surface, the board acted to remove two "rogue" directors and did so at a special meeting for that purpose. All would seem fair, yet a deeper dive into the corporate records establishes a pattern of inattention to the important details established by our Iowa Legislature in Iowa Code chapter 504 (2016). Before we can condone corporate action to remove directors, we study the process to confirm compliance with the law.

Starting with the revisions to chapter 504, we note an increased focus on directors' fiduciary duties. In 2004, a governor's task force was appointed "to examine and enhance the role of Iowa's nonprofit organizations in the building of Iowa communities." Univ. of Iowa, Larned A. Waterman Iowa Nonprofit Res. Ctr., Iowa Principles and Practices for Charitable Nonprofit Excellence ii (Rev. 2016), https://inrc.law.uiowa.edu/publications/iowa-principles-and-practices-charitable-nonprofit-excellence [hereinafter Principles and Practices]. The task force's efforts led to the development of the Principles and Practices, which were most recently revised in 2016. *Id.* The Principles and Practices stresses accountability for charitable nonprofits, which "takes a variety of forms: good management practices, legal mandates, and ethical conduct." *Id.* at 42. In reviewing this board's corporate governance, we emphasize the importance of strict compliance to corporate bylaws and articles of incorporation, along with the statutory requirements guiding corporate oversight.

"[An a]ssociation's governing documents are its declaration and bylaws, which are to be construed as a whole." *Oberbillig v. W. Grand Towers Condo. Ass'n*, 807 N.W.2d 143, 150 (Iowa 2011). Bowers, as executive director of NSRGA, and her board lacked knowledge of important principles and practices related to a nonprofit organization. As time went on, the corporate governance declined so that legal mandates and corporate management became a second thought. Even the district court referenced, not once but twice, this concern.[11]

---

[11] The court noted: "Julie Bowers, simply put, is a very poor business manager. Her recordkeeping and financial reporting is abysmal. . . . NSRGA's books and reporting were a nightmare."

After reviewing the corporate documents, we agree with the district court's concern. But as for the removal of the directors, the requisite attention to detail requires that we reinstate Allen to the board.

In particular, NSRGA significantly reduced the number of meetings it held after 2010. In 2015, NSRGA only held one meeting at year end. The next formal meeting in September 2016 resulted in removal of the dissenting directors Park and Allen. Voting at that September meeting were new directors Laran and Sutherland. If counted, these directors' two votes provided the required majority to remove Park and Allen. There were no formal meetings between 2015 and September 2016 reflecting an election of Laran and Sutherland to the board.

When pressed about the absence of written documentation of the new directors' election to the board, Bowers offered that her daughter was elected on January 2016[12] after a board meeting and discussion at a December 2015 meeting. Believing that votes and business could be conducted by Facebook, Bowers asserted a posting confirmed the election.[13] As for Sutherland, the board confirmed her membership on September 11 as "formally reauthorize, recognize and welcome" of new members. Likewise, Bowers claimed a Facebook vote in April 2016 did the deed. Yet that post simply noted her invitation and acceptance but reflects no vote of any directors confirming her role.[14] "It is also a rule

---

[12] In a January 10, 2016 Facebook post, Bowers wrote, "I am inviting Laran to this page so that she can review notes, posts and files. She has said yes to being on the board and we can put that on the next agenda."

[13] Bowers could point to no official change to the bylaws that allowed telephonic meetings but did not reference votes by Facebook. The January post referenced Laran's interest to serve but noted she would be voted on at a later meeting—that meeting was September 11, 2016, three days after Park and Allen were removed.

[14] In an April 7, 2016 Facebook post, Bowers wrote, "Anna Sutherland was invited to this board and has accepted a position as one of the newest."

governing corporations that the members of the board cannot agree separately, and outside of a meeting, and thereby bind the corporation. Nor can a minority of the board meet and bind the corporation." *Ney v. E. Iowa Tel. Co.*, 144 N.W. 383, 386 (Iowa 1913). Other than the detailed minutes from the September 11 meeting—after the vote to remove Park and Allen—no board minutes exist that conform to the actual NSRGA bylaws supporting the election of new directors.

When asked about following the formal rules, Bowers acknowledged the bylaws were never amended but asserted they needed to be. Directed by the bylaws submitted at trial, removal of a director required votes in favor by a majority of the entire board. If we accept the position that Sutherland and Laran were not officially directors in September 2016, the action of removing Allen and Park fails. If Allen, Park, Diane Roth, and Jaydine Good were directors, along with Bowers who abstained from voting, no majority vote occurred favoring removal. While plaintiff took a contrary position at oral arguments, we find because Bowers abstained from voting, her vote is considered a "no" vote. "Similar to the IBCA (Iowa Business Corporation Act), an abstention is treated as a 'no' vote." 6 Matthew G. Dore, *Iowa Practice Series: Business Organizations* § 40:18 (Nov. 2018 update); *see also* Iowa Code § 504.825(4)–(5). Thus, the vote to remove failed.[15]

---

[15] Roth, Good, and Julie Bowers were legitimately on the NSRGA board. With their votes and the abstention, the final count was: J. Bowers, Allen, and Park as "No" votes and Roth and Good as "Yes" votes, leading to a final vote of three to two against removal.

In effect, Park and Allen remained directors, and the claims dismissed pretrial relating to their director status were viable. With the status question resolved, we examine the ramifications on those claims preserved in this appeal.

**B. Indemnification.** At trial, the plaintiff raised issues of judicial removal of directors, breach of director's standard of conduct, and breach of fiduciary duties by directors Allen and Park. Allen and Park argued Iowa Code section 504.853 requires NSRGA to indemnify them since they were "wholly successful" in the defense of claims related to their director status. These directors avoided any finding of liability against them. A nonprofit corporation must "indemnify a director who was wholly successful, on the merits or otherwise, in the defense of any proceeding to which the director was a party because the director is or was a director of the corporation against reasonable expenses actually incurred by the director in connection with the proceeding." Iowa Code § 504.853. "[A] person [is] considered 'wholly successful, on the merits or otherwise' only if the proceeding 'is disposed of on a basis which does not involve a finding of liability.'" 6 Matthew G. Dore, *Iowa Practice Series: Business Organizations* § 28:16 (Nov. 2018 update) (quoting Model Bus. Corp. Act § 8.52 cmt. (3d ed. 1985 & Supp.)).

On this issue, the district court determined that Allen and Park were not wholly successful, thus not entitled to indemnification, because they "did not act in good faith" and "their conduct was not in the best interests of NSRGA." This conclusion arose from evidence related to their "rogue" actions in trying to block the Stumpf fence construction. But the statute related to mandatory indemnification applies without consideration to good-faith actions or a determination of best interests of the corporation. For mandatory indemnification

to apply, the key question is whether Allen and Park were wholly successful defending the claims lodged against them as directors. If the answer is "yes," indemnification of those reasonable defense costs is warranted.

Plaintiffs argue that under Iowa Code section 504.859, the NSRGA articles of incorporation restrict indemnification to a permissible situation. We disagree. Mandatory indemnification is required by statute where a director establishes entitlement. Iowa Code §§ 504.853, .855(1)(a). Because we find directors Park and Allen were wholly successful at trial, we order payment of reasonable fees and costs associated only with the defense of the director claims urged by plaintiff against Allen and Park.

**C. Conversion of Funds.** Defendants argued at trial that the financial reports Bowers generated were at best unreliable and at worst intentionally false. Based on information gleaned from discovery, defendants urge that Bowers misappropriated funds meant for the bridge restoration project. FBMB demands the return of $19,500 for the bridge project.[16] Likewise, Allen asserts Bowers used the NSRGA checkbook as her personal checkbook. Under this record, NSRGA operated without corporate protections and oversight. With those concerns in mind, various board members withdrew early on citing "alarm bells were going off" based on the lack of accounting of funds.

---

[16] This sum originates from this calculation: FBMB funds of $8000 + $10,000 spent on an unrelated Alabama project + $1500 discrepancy on payment of construction expense—allegedly paid $20,000 on an $18,500 invoice.

Yet no party presented a full accounting of these funds in this case.[17] As confirmed by the district court, no "simple financial report listing all income received for the property and listing all disbursements" found its way into the evidence. To that end, the district court described NSRGA's reports and books as a "nightmare" and Bowers's recordkeeping as "abysmal." At the same time, defendants presented no exhibit detailing an accounting of funds or claimed misappropriations. Still, defendants argued that Bowers, on behalf of NSRGA, misappropriated and converted at least $19,500 given to FBMB for the bridge project.

"Conversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property." *Ezzone v. Ricciardi*, 525 N.W.2d 388, 396 (Iowa 1994). As a starting point, defendants have the burden to prove a possessory interest in the property converted. *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 188 (Iowa 2010). We agree with the district court's denial of the conversion claim and the holding that the evidence did not prove Bowers wrongfully converted funds. At the heart of a conversion claim is control over another's property. NSRGA's accounting lacks clarity, but defendants shed no helpful light on the money trail to establish its entitlement to the funds. Under this record, defendants failed to prove a claim for conversion.

**D. Standing to Pursue Dissolution.** The trial court made slight reference to this issue but articulated a lack of evidence to support dissolution. The plaintiff argued these removed directors lacked standing to request this remedy. Allen and

---

[17] During oral arguments, counsel for defendants conceded an inability to prove that bridge funds raised were not spent for the renovation.

Park argue because they were not legally removed as directors at the September 8, 2016 meeting, they had standing to pursue judicial dissolution of NSRGA. To support their claim for judicial dissolution, the defendants assert that Bowers wasted or misappropriated NSRGA assets to the detriment of the bridge project and FBMB. Focusing on director Julie Bowers, they urge that her control of NSRGA is illegal along with her use of its assets. "The law commonly describes the fiduciary duties of corporate directors as twofold, consisting both of a duty of care and a duty of loyalty." *Cookies Food Prods., Inc. v. Lakes Warehouse Distrib., Inc.*, 430 N.W.2d 447, 451 (Iowa 1988). "[T]he burden is upon a managing officer or director of a corporation to prove good faith, fairness and honesty in his transactions with it . . . ." *Kurtz v. Oxborrow*, 4 N.W.2d 857, 858 (Iowa 1942).

Under Iowa Code section 504.1431(1)(b), corporate members may bring an action for judicial dissolution of that corporation under specified circumstances.[18] Allen and Park argue the NSRGA board's and Bowers's lack of financial oversight supports dissolution.

---

[18] Iowa Code section 504.1431(1)(b) provides,

> b. Except as provided in the articles or bylaws of a religious corporation, in a proceeding brought by fifty members or members holding five percent of the voting power, whichever is less, or by a director or any person specified in the articles, if any of the following is established:
> (1) The directors are deadlocked in the management of the corporate affairs, and the members, if any, are unable to break the deadlock.
> (2) The directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent.
> (3) The members are deadlocked in voting power and have failed, for a period that includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have, or would otherwise have, expired.
> (4) The corporate assets are being misapplied or wasted.

We do not find that dissolution of NSRGA is a reasonable remedy on this record. Like the conversion claim, the evidence failed to establish the requisite failures necessary for dissolution of NSRGA. Even so, we cannot condone the conduct of the board, its lack of corporate oversight and recordkeeping, the longstanding history of failure to operate under sound principles and policies related to legal requirements of the Iowa Legislature, and the exposure of the potential "tip of the iceberg" inappropriate use of funds by Bowers. While courts may fashion other reasonable alternatives instead of dissolution, we urge these directors to attend the available training on the fiduciary duties and role of directors in a nonprofit corporation. Iowa Code § 504.1431(2)(a) (requiring the court to consider "reasonable alternative to dissolution"); *see also Sauer v. Moffitt*, 363 N.W.2d 269, 275 (Iowa 1984) (imposing other equitable relief in a minority shareholder for profit farm corporation action). We deny the request to dissolve NSRGA.

**E. Request for Sanctions.** Finally, defendants argue that sanctions are appropriate here because neither the plaintiff nor its counsel undertook a reasonable investigation before initiating this lawsuit and because the lawsuit was filed in bad faith and for an improper purpose. The district court denied the request for sanctions reasoning that an earlier ruling in the case disposed of the issue. In this hard-fought case, defendants take issue with the narrative detailed by Bowers and her witnesses. In the heat of this battle between the parties, we do not find that NSRGA or its counsel asserted frivolous positions. Instead, each party's version of facts, as often is the case, comes from different perspectives. We review

this issue for an abuse of discretion. *Wemett v. Schueller*, 545 N.W.2d 1, 3 (Iowa Ct. App. 1995). We find no abuse of discretion.

**IV. Disposition.**

For all of the above-stated reasons, we affirm in part and reverse in part the district court ruling. We remand for a determination of the reasonable fees and expenses limited to the defense of plaintiff's claims against Park and Allen.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**