# IN THE COURT OF APPEALS OF IOWA

No. 24-2026
Filed December 3, 2025

**RICHARD J. ERWIN,**
        Plaintiff-Appellant,

**vs.**

**MICHAEL G. ERWIN, in his capacity as Manager of Erwin Farms II, LLC and ERWIN FARMS II, LLC,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Warren County, Michael Jacobsen, Judge.


        A plaintiff appeals an adverse ruling on his derivative and direct claims and requested injunctive relief. **AFFIRMED AND REMANDED TO DETERMINE ATTORNEY FEES.**


        Elizabeth R. Meyer (argued) of Dentons Davis Brown, PC, Des Moines, for appellant.

        Benjamin J. Kenkel (argued), William M. Reasoner, and Theodore W. Craig of Dickinson, Bradshaw, Fowler & Hagen, P.C., Des Moines, for appellee.


        Heard at oral argument by Chicchelly, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Richard J. Erwin (R.J.) appeals the district court's denial of his claims against his father, Michael G. Erwin (Mike) and Erwin Farms II, LLC (EF2). R.J.'s derivative claim challenges Mike's management of fencing materials, the leases he entered as manager of EF2, his management fees, and the capital accounting. He also claims direct damages from Mike making capital distributions, failing to deliver an annual report fast enough, and by hiring a third party to mow hay for the farm. R.J. requested equitable relief by removing Mike as manager of EF2 or injunctive relief by the court mandating Mike's compliance with the operating agreement. Finally, R.J. challenges the district court's attorney-fee award. On our review, we affirm and remand to determine reasonable appellate attorney fees.

## I.    Background Facts and Proceedings

In 2012, as part of their estate plan, Mike and his wife Janet (R.J.'s mother) formed EF2, transferring around 950 acres of agricultural property—which the family called the Turner Farm—into the LLC. The property was "a mix of basically hay ground, pasture ground, and crop ground" with a creek running through the middle. The property surrounds a 2.6-acre homestead on three sides; the homestead was split from Turner Farm and sold to R.J. in 2006 or 2007. Several agricultural outbuildings surround the homestead but are located on EF2 land. The outbuildings were accessed via an easement created when the R.J. bought the homestead; the easement lets EF2 use the driveway across R.J.'s homestead to reach the outbuildings, though a new entrance to the farm has recently been constructed just down the road from the homestead.

3

EF2 is governed by an operating agreement, which establishes two classes of interests with different voting entitlements. Mike and Janet initially split the shares equally—each with 10% EF2 ownership in Class A shares and 40% EF2 ownership in Class B shares. Then they each gifted R.J. with 25% Class B shares EF2, resulting in his 50% ownership of the LLC; he did not pay for or otherwise contribute anything of value to obtain his interest.

| Member | Class A Units | Class B Units | Voting Rights Class A | Voting Rights All Members | Profit/Loss Share |
|---|---|---|---|---|---|
| Michael Erwin | 100,000 | 150,000 | 50% | 25% | 25% |
| Janet Erwin | 100,000 | 150,000 | 50% | 25% | 25% |
| Richard Erwin | 0 | 500,000 | 0% | 50% | 50% |
| **Total** | **200,000** | **800,000** | **100%** | **100%** | **100%** |

Class A membership interests vote on all member voting matters. Class A members have the exclusive right to elect or remove a manager, the power to dissolve or merge EF2 with another entity, consent or approve of disposition of "all or substantially all of the assets," consent to the transfer of interests, request an annual meeting. Class B interests are entitled to a share of the profits and have voting rights to all matters not reserved to Class A.

Mike has been manager of EF2 since its inception in 2012. The manager has "complete authority over and the exclusive control and management of the business and affairs of [EF2], including, without limitation, the making of all determinations on behalf of [EF2] in connection with [Turner Farm.]" For his farm and LLC management fees, Mike is to be paid "reasonable compensation commensurate with the value of the services rendered," which he interprets as "10% of the gross, which is a typical fee for managing a farm." When EF2 was

formed, Turner Farm had a mortgage on it; as manager, Mike used EF2's available cash toward the mortgage payments, then he and Janet paid what EF2 couldn't on the note as additional capital contribution.

In 2016, R.J. sued Mike and EF2 after Mike failed to separate his operation of EF2 from his personal finances and the operation of at least one other similar farm LLC—a clear breach of the restrictions on a manager under the operating agreement. The court appointed a temporary receiver, who helped Mike learn how to manage EF2 as an LLC rather than as a sole proprietorship. The district court in that case found Mike violated the operating agreement and his fiduciary duties, ordering Mike reimburse some monies to EF2 and for EF2 to issue income distributions to R.J. in line with the payments previously made to Mike and Janet. The court found in favor of Mike on a counterclaim for an equipment purchase, ordering R.J. make payment on the purchase. The court declined to order attorney fees for either party. On review, a panel of this court agreed Mike breached his fiduciary duties and the operating agreement, reversed and ordered damages on a separate incident, and affirmed the court declining to order attorney fees. *See Erwin v. Erwin*, No. 19-1978, 2021 WL 359496, at *8 (Iowa Ct. App. Feb. 3, 2021).

Starting in 2007, R.J. leased and farmed the Turner Farm ground from his parents and then EF2 on a 70/30 crop-share arrangement with a cash-rental agreement for the hay and pasture ground; there was no written lease. After R.J. initiated the 2016 litigation against Mike and EF2, his lease was terminated. EF2 now leases the outbuildings and around 750 acres—primarily crop ground and pasture—to John Davidson.

In August 2022, R.J. again filed suit against Mike and EF2. R.J. alleged Mike "converted property of [EF2] for his personal use, or for the use of other business entities in which he is a member, without making payment to [EF2]." R.J. further alleged unfair distributions of profits, failure to provide annual reports, and other assorted claims of mismanagement of EF2. R.J.'s legal claims consisted of (1) a derivative claim of breach of fiduciary duty and self-dealing against Mike as manager of EF2, (2) a direct claim against Mike as manager for breaching his duties of care and loyalty, and (3) a request the court place EF2 back into receivership.

At a one-day bench trial, R.J. and Mike provided the only testimony and submitted numerous exhibits to the court. For brevity and clarity, the facts relevant to each issue will be included in the discussion below rather than detailed here. The court denied all R.J.'s claims and ordered R.J. pay attorney fees for Mike in his individual capacity, which were to be reimbursed to EF2. R.J. appeals.

## II. Standard of Review

This case was tried in equity, and so our review is de novo. *See Baur v. Baur Farms, Inc.*, 832 N.W.2d 663, 668 (Iowa 2013). But our review of "contract interpretation and construction is at law." *Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 683 (Iowa 2020). And we review attorney fees decisions for an abuse of discretion. *Id.* at 684. While we are not bound by the district court's factual findings, we give them weight, "especially with regard to the credibility of witnesses." *Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 97 (Iowa 2011).

### III.    Discussion

The district court resolved nearly all the contested issues based on the business judgment rule.  The manager's duty of care to an LLC is subject to the business judgment rule, and that duty is satisfied if the manager is not interested in the subject matter of the judgment, is informed about the subject to the appropriate extent, and has a rational basis for believing the decision is in the company's best interests.  Iowa Code § 489.409(3), (7) (2022).  The manager "shall discharge the duties . . . under the operating agreement and exercise any rights consistently with the contractual obligation of good faith and fair dealing." *Id.* § 489.409(4).  "Iowa law dictates that an LLC is bound by its operating agreement." *Retterath*, 938 N.W.2d at 687.

"The heart of the business judgment rule is judicial deference to business decisions by corporate directors." *Oberbillig v. W. Grand Towers Condo. Ass'n*, 807 N.W.2d 143, 154 (Iowa 2011) (cleaned up).  It "applies when directors act in good faith in making a business decision, when the decision is reasonably prudent, and when the directors believe it to be in the corporate interest." *Id.* (cleaned up). "The purpose of the rule is to severely limit second-guessing of business decisions which have been made by those whom the corporation has chosen to make them." *Hanrahan v. Kruidenier*, 473 N.W.2d 184, 186 (Iowa 1991).  "We will not substitute our judgment for the interpretation of the [decision maker] if the factual predicates for the rule are present." *Oberbillig*, 807 N.W.2d at 156.  "A person challenging the business judgment of a member has the burden of proving a breach of the duty of care, and in a damage action, the burden of proving that the breach was the legal cause of damage suffered by the limited liability company."  Iowa Code

§ 489.409(7)(b). "When directors act in good faith in making a business decision, when the decision is reasonably prudent, and when the directors believe it to be in the corporate interest, there can be no liability." *Hanrahan*, 473 N.W.2d at 186.

In addition to the business judgment rule, the district court relied on an operating-agreement provision limiting the liability of a manager—"The Managers shall not be liable, responsible, or accountable . . . in damages or otherwise for any acts performed or omitted in good faith." And under a manager-indemnity provision, EF2 holds Mike harmless from any and all loss, claim, liability, or cost incurred when acting on behalf of the company unless through bad faith, gross negligence, willful malfeasance, or fraud.

## A. Derivative Claims

R.J.'s derivative claim asserted Mike breached his fiduciary duties and the operating agreement in a variety of ways. On appeal, he contends these breaches "constitute gross negligence." The alleged breaches include taking fencing materials, lease issues, unreasonable management fees, and how the capital accounting was prepared and distributions accounted for.

*1. Fencing materials.* In 2020, R.J. observed truckloads of fence posts "logged out of these trees that have been pushed down and sawed up" being removed from the property. Around the same time, EF2 was also buying additional fencing material. R.J. estimated the posts that left the property were worth "anywhere from $3000 to $6000," but the annual report did not show any income from selling the posts. R.J. also alleged some of the posts were taken to one of Mike's other farms. He estimates EF2 should have realized $38,400 from the posts that left the property.

Mike testified EF2 was clearing hedge trees from the property, and he entered into an arrangement with a third party to cut the cleared "trees into posts on a 50/50 share basis"—that is the third party would keep half the posts cut in exchange for their labor, and EF2 would keep half. He explained that EF2 built or replaced "probably five miles of fence" over the past several years, each mile needing around 400 posts, half of which were from the posts cut as part of this deal. EF2's share of the posts was all used on Turner Farm, and EF2 did not need to purchase any wood posts for all the new fencing. Mike then personally bought some of the posts and used them on some of his other farms.

We agree with the district court that ensuring adequate fencing for the property is well within the role of manager. R.J. has not proved that Mike's arrangement with the third party—exchanging posts for labor—was not made in good faith or a reasonable business decision. Mike provided a receipt for the posts he personally bought from the third party for a different farm, and the 2020 checking-account reconciliation shows several payments relating to fencing repairs and labor. We apply the business judgment rule, find the fencing decision to be reasonably prudent, and affirm. *See Oberbillig*, 807 N.W.2d at 154–56.

*2. Leases.* R.J. offers several ways he thinks Mike's leasing decisions have not been in the best interests of EF2. First, he argues Mike and EF2 entered into false leases for Mike's own benefit. EF2 leases the farm—including crop land, hay land, and pastureland—to Davidson using lease rates from the annual Iowa State Cash Rental Survey. Davidson then subleases the pasture acres to Janet for the same price, and she runs cattle on the acres. R.J. claims "[t]here is no evidence in the record of any payments actually being made on such subleases." But why

would there be? Neither Davidson nor Janet was party to this case—nor was Mike in his individual capacity or his farm operation with Janet—so they were not subject to discovery on the issue. The EF2 checking reconciliations do show deposits for the full land rent in accordance with the lease agreements, so we find this argument meritless.

And R.J. argued that based on his observation, he "felt like . . . John Davidson was actually farming 400 acres of row crop" instead for the leased 350 by taking acres "out of hay and . . . into crop ground." And on appeal he frames this claim as Mike breached his fiduciary duty by "not charging rent on all of the acres being farmed" by Davidson. Examining the leases, EF2 is leasing more crop acres and fewer hay acres now than when Davidson began renting the farm—going from 315 crop and 108 hay in 2019 to 366 crop and 50 hay acres in 2023. R.J.'s testimony included that, when he was farming the crop ground, what he used "could have ranged from 320 acres to . . . 400 acres, depending on what the rotation is." We find EF2 leasing an average of the historically farmed acres to be a reasonable business decision.

Related to the pasture, R.J. also asserts some of the pasture acres were used for haying, and so EF2 should have charged more than double the rate per acre for those acres. Mike explained that the farm has four pastures, and the cattle are rotated among them, with the rotations changing based on weather conditions like drought or flood. If the cattle weren't going to be moved to a pasture, the hay that grew there would be mowed and stored to be eaten by the cattle later. In other words, the land was primarily used as pasture, although perhaps not exclusively

depending on the rotation. We see no breach of fiduciary duty in EF2 leasing the pastureland according to its primary use.

Third, R.J. asserts Mike was not charging appropriate rent for EF2's hunting rights. In 2019, EF2 had leased hunting rights to R.J. and his friends for $6000. In Davidson's 2020 lease, EF2 "retain[ed] recreation use," but no hunting lease was entered by any party. Starting in 2021, the hunting lease went to Davidson at a rate of $3000. Mike explained the change—R.J. and his friends had been hunting the land in the past, but they thought the $6000 was too high, didn't like having to hunt female deer as well as the bucks, and left gates open allowing cattle to get into the road and the river, so Mike stopped renting to them. But then Davidson's crop sustained damage from the wildlife, and he complained about it. Mike solved the problem by telling Davidson, "You take care of the wildlife, and you can have the lease at $3000." Given the past hunters did not want to pay the fee R.J. claims should have been charged and the need as manager to control the deer population on the property to preserve crops, Mike's explanation is reasonable and clearly falls within the business judgment rule. R.J. has offered no countervailing evidence to establish a breach of the duty of care on this question.

*3. Management fees.* R.J. argues Mike distributed an unreasonable management fee to himself in 2020. Mike's counsel explained it was his management fee for 2017–2019, at a rate of 10%, which is supported by the income statements for those years not including a management fee. R.J. considers this unreasonable and urges "Mike was not entitled to any management fee" for those years because the receiver appointed in the prior litigation was also helping manage EF2. The prior litigation reduced Mike's management fee to an

amount commensurate with the value of his services which, for the years considered in that litigation, was "dismally poor" with financial paperwork and related tasks. While Mike did have a receiver to help supervise some management tasks during those years, Mike's management duties were somewhat increased because of R.J.'s litigation, Mike was making efforts to improve his performance with the financial side of the LLC management, and he supervised the installation of a new driveway for farm use. While the prior litigation district court found a 6%–7% management fee may be more standard, the manager's duties in the years in question were not necessarily "standard" for farm management.

*4. Capital accountings.* R.J.'s last derivative claim was that "Mike is utilizing the capital accountings to his advantage, justifying release of funds from [EF2] while not being required to release funds to R.J.," claiming Mike should not be allowed to capital expense items he and Janet fronted the payment for, and that the court should have required Mike to prepare a new capital accounting and present it to the court for final approval. R.J. contests some of the numbers used for 2013–2015, arguing they are not consistent with the ruling from the prior litigation.[1] Mike responds he did the calculations using actual debt payments and stipulated revenue and expenses, and that capital return distributions are different from profit distribution and do not need to be made in equal parts. Mike testified that he had done his calculations to be in favor of R.J., and he was willing to revise the capital accounting. The district court ruled, "Mike and Janet were entitled to

---

[1] Unsurprisingly, R.J. does not contest any of the adjustments made that were to his benefit—for example crediting his capital account with the value of the gifted shares according to the gift tax returns, despite his agreement he had not given value to EF2.

credit for their contributions to [EF2]. The capital account was properly calculated using conservative figures. Distributions were proper as a return of capital to Mike and Janet."

We agree Mike and Janet are entitled to credit for their contributions, including their payments on EF2's debts, and that distributions are perfectly within Mike's right to disburse—though we recognize more detailed records describing the distributions made might be better accounting. R.J. was consulted about the baseline numbers used in the capital accounting, and he did not provide a response while the accounting was being prepared. We agree with the district court that Mike's approach to the capital accounting was done in good faith and in attempted consultation with R.J. and falls squarely within the business judgment rule.

*5. Summary.* Mike, as manager of EF2, had considerable latitude to make decisions he considered to be in the company's best interests. R.J. may not like how Mike manages the company, but Mike and Janet retained all the rights to management of the LLC under the operating agreement. The district court found "all evidence from trial demonstrates that Mike's activities in the leasing of the company farm ground was done in good faith, was reasonably prudent, and was done under the belief it would benefit the company." And with "no evidence at all in the record that would show that Mike acted in bad faith, or with gross negligence, willful malfeasance, or fraud," the operating agreement holds him not liable. We affirm the district court's ruling on the derivative claims.

**B. Direct Claim**

In his post-trial brief, R.J. only reasserted direct money damages as to a Conservation Reserve Program (CRP) land hay claim.  Yet, on appeal, he also asserts direct claims regarding the disbursements and damage from delayed annual reporting.  Assuming without deciding all three issues were adequately preserved for our review, we address each in turn.

The distributions R.J. challenges were to Mike and Janet for amounts corresponding to the judgment disbursement ordered to R.J. in the prior litigation. From his testimony, Mike did not originally understand the judgment disbursement was an equalizing distribution.  After paying R.J. the judgment amount in spring 2021, he made end-of-year disbursements to himself and Janet to balance the distribution to R.J., trying to comply with the operating agreement.  R.J. pointed out the error and demanded equalization, and Mike disbursed the equalization to R.J. in 2022.  The only relief R.J. requests is equitable remedies and attorney fees, which we address below.

For his annual reporting claim, R.J. claims the late delivery—March 25, 2022 for the 2021 annual report—"is at minimum grossly negligent," asserting the harm of engaging counsel to enforce his rights and seeking "equitable relief and attorney fees" because he had filed suit by then to compel accounting.  The court accepted Mike's testimony that he had provided R.J. with annual reports, and that the reports would now be sent via certified mail with a return receipt.  Mike provided as evidence two return receipts from spring 2022 for the 2021 annual report, along with his own attorney's letter observing R.J. did not complain prior to suit about the 2020 annual report.

The operating agreement does not provide a specific timeline for the provision of an annual report, instead simply requiring it be prepared and delivered to interest holders "promptly after it has been prepared."  So the timing is under the manager's reasonable judgment after the end of the fiscal year.  The best way to prevent future litigation on this issue and prevent the only harm suggested by R.J.—the expense of attorneys—would be for Mike and R.J. to come to an agreement for when the annual report is due.  In the meantime, it is reasonable for the annual report to be distributed to interest holders no later than when annual tax documents are distributed.

The last direct-claim issue relates to an instance in 2022, when EF2 hired the farm tenant Davidson to mow and bale hay on CRP-contracted land (which was part of EF2 land Davidson did not rent) on a 50/50 share basis—Davidson was entitled to half the bales for his work, and EF2 was entitled to half, which then was split between Mike, Janet, and R.J. according to their shares.  R.J. claims Mike "unnecessarily retained the tenant to mow and bale" resulting in half the hay being retained by the tenant and reducing R.J.'s share of the bales by half.  R.J. argued because he owned a mower, hayrake, and baler, and he "could have bailed this hay and done it myself," and "I should get 100 percent of what I mow and bale." R.J.'s desire for a larger share of the cut hay does not render Mike hiring Davidson on a 50/50-share basis unreasonable.  Under the circumstances, we agree with the district court it was well within the deference recognized by the business judgment rule for Mike as manager to decide to hire EF2's tenant to bale the hay.

## C. Equitable Relief

R.J.'s main goal in his appeal appears to be equitable relief in the form of removing Mike as manager of EF2. His argument appears to largely mirror his argument from the prior litigation, where the district court declined to remove Mike as manager and found "it lacked the authority to remove the manager pursuant to the terms of the operating agreement" without the agreement of the parties. *Erwin*, 2021 WL 359496, at *6. He argues that on our review, this court did not find the court lacked authority to remove the manager. *See id.* R.J. urges us to find his member's rights oppressed and rely on *Baur v. Baur Farms, Inc.*, 832 N.W.2d at 677, to use our equitable power to remove Mike as manager. In the alternative, R.J. asks for a permanent injunction mandating Mike comply with the operating agreement. And he asks the court order "the manager of [EF2] to appoint a professional, neutral, accredited farm manager."[2]

In essence, R.J. is asking this court to wholly override the operating agreement's article on management of the company by (1) removing Mike as the current manager, (2) removing Janet as successor manager, (3) preempting Mike and Janet's rights as Class A shareholders to elect a manager, and/or (4) abrogate all the LLC's manager powers by appointing a third party to perform the manager's functions while not actually LLC manager. We decline to do so. Mike has improved his management abilities since the prior litigation and has made corrections to financials when needed. And R.J. has not proven alleged retaliatory

---

[2] While R.J. argued this issue below, the district court did not directly address it. We assume R.J. and EF2 believe error preserved by the court's general dismissal of all of R.J.'s claims. We assume without deciding the issue is before us.

conduct in Mike's management of EF2. R.J. agreed to the terms of the operating agreement when he signed onto the provisions to receive his shares, including the terms setting the requirements for removal and replacement of a manager, as well as his lack of voting power in that decision. *See* Iowa Code § 489.111[3] ("A person that becomes a member of a limited liability company is deemed to assent to the operating agreement."). And Mike is successfully managing EF2 as a profitable endeavor. We see no evidence R.J. sought removal, appointment of a different manager, or manager oversight through the means offered in the operating agreement—i.e. seeking Janet's input as the other Class A interest holder.

Nor do we think a permanent injunction mandating operating agreement compliance is warranted. We explained in the prior litigation, "A plaintiff who seeks a permanent injunction must establish (1) an invasion or threatened invasion of a right; (2) that substantial injury or damages will result unless the request for an injunction is granted; and (3) that there is no adequate legal remedy." *Erwin*, 2021 WL 359496, at *6 (cleaned up). As in that litigation, we find R.J. has not met his burden to prove the permanent injunction is necessary.

### D. Attorney Fees

Both R.J. and Mike requested an award of attorney fees and costs under the operating agreement. "Ordinarily, an award of attorney fees is not allowed unless authorized by statute or contract." *Retterath*, 938 N.W.2d at 707. The operating agreement contains the following fee authorization:

> Dispute Costs. In the event that litigation or arbitration is instituted between the parties to this Agreement with regard to any matter,

---

[3] This statute was renumbered to Iowa Code section 489.106(2) as of 2024. However, we are applying the law as it existed when R.J. brought this suit in 2022.

including, without limitation, indemnification and recovery of expenses and costs to enforce rights pursuant to this Section, arising pursuant to this Agreement or the transactions contemplated hereunder, the unsuccessful party or parties in any such action shall pay to the prevailing party or parties all reasonable costs and expenses, including, without limitation, attorney fees and expenses, incurred by the prevailing party or parties in the action.

Because it found Mike was the prevailing party on the claims brought by R.J., the court ruled Mike "should be awarded his attorney fees and costs related to R.J.'s claims."

*R.J.'s attorney fees.* R.J. claims the district court should have awarded him reasonable attorney fees. His argument for a fee award in the direct claim depends on this court finding Mike breached the operating agreement. R.J. also argues that under Iowa Code section 489.906 he should have been awarded reasonable expenses for his derivative claim.[4] Because we affirm the district court's ruling on R.J.'s derivative and direct claims and injunctive relief, he is not entitled to an award of attorney fees under either the operating agreement or section 489.906.

*Mike's attorney fees.* The district court taxed Mike's reasonable attorney fees relating to R.J.'s claims against R.J. R.J. argues this was in error because Mike did not specifically assert entitlement to attorney fees before trial. He bases his argument on *Nelson Cabinets Inc. v. Peiffer*, 542 N.W.2d 570, 573 (Iowa 1995), where the court ruled "attorney fees must be specifically pleaded before they may be awarded." The fees in *Nelson* were claimed under a statute providing a right to recover attorney's fees on a specific type of claim. 542 N.W.2d at 573 (discussing

---

[4] Iowa Code section 489.906(2) (now renumbered to Iowa Code § 489.806(2)) provides, "If a derivative action . . . is successful in whole or in part, the court may award the plaintiff reasonable expenses, including reasonable attorney fees and costs, from the recovery of the limited liability company."

Iowa Code § 535.11(8)). Mike responds that attorney fees pursuant to a contract are different and are determined after judgment with other costs. *See* Iowa Code § 625.22(1) ("When judgment is recovered upon a written contract containing an agreement to pay an attorney fee, the court shall allow and tax as a part of the costs a reasonable attorney fee to be determined by the court."); *Bankers Tr. Co. v. Woltz*, 326 N.W.2d 274, 278 (Iowa 1982) ("Since no party is entitled to costs until a judgment is recovered, a party has no vested right to costs at the commencement of the action." (internal citation omitted)). In the prior litigation, this court used section 625.22 and the operating agreement attorney fees provision to review the district court's discretion in its attorney-fee determination. *Erwin*, 2021 WL 359496, at *7–8.

Contrary to R.J.'s argument that he did not pursue a contract action, the operating agreement is the basis for all his claims challenging Mike's management. "LLCs are ultimately member contracts," *Barkalow v. Clark*, 959 N.W.2d 410, 421 (Iowa 2021), and "as a condition to becoming a member in [EF2]," R.J. executed his agreement to be "subject to" and "bound by the provisions of the operating agreement." And the attorney-fee award was raised before the district court's ruling and was argued by both parties in motions to enlarge, amend, and reconsider. Applying section 625.22, we find the attorney-fee question was properly before the court and R.J. both had notice of and was bound by the fee-shifting and other provisions in the operating agreement. So we find the district court did not abuse its discretion in the attorney fee award.

Mike also requested reasonable appellate attorney fees. We have made clear in a published case that we prefer parties file appellate-attorney-fee affidavits

"immediately after oral argument or after the case is submitted without oral argument." *In re Marriage of Samuels da Fonseca Silva*, 15 N.W.3d 801, 808 (Iowa Ct. App. 2024). Unfortunately, despite our inquiries and suggestions at oral argument, no appellate-attorney-fee affidavit has been filed. Although we could consider this a reason to deny the fee claim outright, we instead elect to remand for the district court to determine a reasonable amount of appellate attorney fees for R.J. to pay Mike. *See id.*

**AFFIRMED AND REMANDED TO DETERMINE ATTORNEY FEES.**